## IN THE MATTER OF THE ESTATE OF THOMAS H. BLYTHE, DECEASED.

### [No. 2,401; decided July 31, 1890.]

**Legitimation of Child—Construction of Statute.**—Section 230 of the Civil Code, providing for the adoption of an illegitimate child by its father, is to be liberally construed.

**Legitimation of Child—Proof of Paternity.**—Under section 230 of the Civil Code, which provides for the adoption of an illegitimate child by its father, the proof of paternity must be strict and plenary.

**Legitimation of Child—Purpose and Policy of the Statute.**—In examining the claim of the plaintiff to heirship by virtue of legitima-

tion under section 230 of the Civil Code, the court observed: Plaintiff claims, primarily, under section 230 of the Civil Code, which requires the institution of heir or adoption to be made by the father. It must be the father. The institution of heir is the primary object of the statute. The succession of property rights is incidental; it is a status that is involved; it is the relation of the child to society.

**Legitimation of Child—Evidence of Paternity.**—After an extended examination of the evidence concerning the adoption of an illegitimate child by her father, the court expressed the opinion that three of the elements of section 230 of the Civil Code were established: (1) There was an illegitimate child; (2) the plaintiff was and is that child; (3) the decedent here was the father of that child.

**Legitimation of Child—Receiving into Family.**—The most satisfactory way of establishing that a father has publicly acknowledged his illegitimate child, as required by section 230 of the Civil Code in providing for the legitimation of children, is by proof that the child has been received into the family and given the family name, but this is not necessary where there is sufficient proof of a reason for not having done either.

**Legitimation of Child—Acts Necessary Thereto—Evidence.**—Under section 230 of the Civil Code, there are four essentials to the adoption of an illegitimate child by its father: (1) He shall be the natural father; (2) he shall publicly have acknowledged himself to be the father; (3) he shall have received the child into his family; (4) he shall have otherwise treated it as his legitimate child. The evidence in this case, which, among other elements of proof, embraces oral declarations and letters of the alleged father, is examined by the court and held sufficient to meet the requirements of the statute, although the father did not actually take the child into such family as he had.

**Legitimation of Child—Alien Children.**—A father domiciled in California may, under section 230 of the Civil Code, adopt his illegitimate child who, with her mother, is domiciled in England. The law of California governs and bestows on the child the capacity of heir.

**Legitimation of Child—Written Acknowledgment.**—Under the former rule of strict construction it was necessary, in order to comply with the law declared in section 1387 of the Civil Code, which provides that an illegitimate child is the heir of a person who in writing acknowledges himself to be the father of such child, there must be a paper formally made and executed. There must be a witness, not a mere spectator; but a witness in such case must be one who sees the execution of the paper, and attests it as a witness to confirm its authenticity in anticipation of being called to testify to the act; there is an absolute necessity that there should be a witness called for that purpose by the subscriber, and there must be an express intention on the part of the latter to make the acknowledgment of the illegitimate child. These strict rules, however, no longer prevail: See Blythe v. Ayres, 96 Cal. 532, 102 Cal. 254.

Legitimation of Child—Effect of Written Acknowledgment.—A written acknowledgment by a father of his illegitimate child, under section 1387 of the Civil Code is not ambulatory in its nature like a will, but, once executed, is irrevocable; it creates a status, and cannot thereafter be changed. The moment the writing is executed in conformity with the statute, the illegitimate child is an heir, and no subsequent act of either party can alter that legal relation.

Legitimation of Child—Evidence of Written Acknowledgment.—The court held on the whole case that the evidence established a statutory adoption and acknowledgment, but that the case of plaintiff so far as it depended on a so-called "adoption paper" was not made out. The proof was ample otherwise.

Contest as to heirship under section 1664, Code of Civil Procedure.

W. H. H. Hart, attorney for plaintiff.

McAllister & Bergin, John H. Boalt and W. W. Foote, of counsel for plaintiff.

Edward Robeson Taylor, representing absentees, by appointment.

McKoon & Towle, for the "Blythe Company."

S. W. Holladay and E. B. Holladay, for the "Kentucky Blythes."

T. J. Lyons and associates, for the "Savage Heirs."

Harvey S. Brown, for the "Williams Heirs."

L. E. Bulkeley, for the "English Savages."

H. E. Highton and E. D. Wheeler, for Alice Edith Dickason Blythe, alleged widow of decedent.

And various other attorneys for other claimants.

### CHARACTER OF THE ACTION.

COFFEY, J. This is an action instituted under section 1664 of the Code of Civil Procedure (approved March 18, 1885) by the plaintiff, a minor, through her guardian, to determine the heirship and title to the estate of Thomas H. Blythe, deceased; which section provides that in all estates now being administered, or that may hereafter be administered, any person claiming to be heir to the deceased, or en-

titled to distribution in whole or in any part of such estate, may, at any time after the expiration of one year from the issuing of letters testamentary or of administration upon such estate, file a petition in the matter of such estate, praying the court to ascertain and declare the rights of all persons to said estate and all interests therein, and to whom distribution thereof should be made.

Plaintiff in due season filed her complaint setting forth the facts of her claim of heirship in the estate, and thereafter, in the time required by the statute, certain defendants, whose claims are hereinafter to be considered, appeared and made answer, traversing the pretensions of plaintiff to be the child and heir of decedent, and alleging that she was the offspring of one Joseph James Ashcroft and his wife, Julia Ashcroft, née Perry, and by way of cross-complaint averring respectively their own claims to heirship, ownership or interest in the estate; and all of these counterclaims and allegations have been in turn denied by plaintiff, and other parties summoned as defendants made default duly entered on the record.

The trial of the issues thus joined between the parties litigant began on the 15th of July, 1889, before the court, without a jury, an express waiver of a jury having been made in open court.

### THE PLAINTIFF'S CLAIM.

The substance of plaintiff's claim, as stated in her complaint (second amended complaint, filed April 26, 1887, and amendments to second amended complaint, filed September 11, 1889), is that said Florence Blythe was born on the eighteenth day of December, 1873, and that on July 11, 1883, and prior thereto and since, and now is a resident of this city and county and state; that the said Thomas H. Blythe was a citizen and resident of this state and of the United States from August 31, 1855, up to the time of his death, on the fourth day of April, 1883; that at the time of his death said Blythe owned and possessed certain real property described in said complaint; that on the twelfth day of June, 1883, letters of administration were issued on said estate to Philip A. Roach, who duly qualified as administrator, and who was acting as such at the time of the filing of her complaint; that neither

the whole nor any part of the estate has been distributed; nor had any proceedings for final distribution been had; that at the time of the death of the said Blythe the said Florence was and she still: is the only child and daughter and only living offspring of said Blythe, and his sole heir at law, and as such was and is entitled to have and receive on distribution the entire estate and property of said Blythe, deceased, wheresoever the same may be situated; that said Blythe left him surviving no wife, no father, no mother, no brother, no sister, no next of kin, nor child save the said Florence.

### ACKNOWLEDGMENT AND ADOPTION ASSERTED.

After reciting the proceedings in court pursuant to the notice given as required by statute, section 1664, Code of Civil Procedure, and the names of the parties defendant who appear as claimants in opposition to her claim, plaintiff avers that she was born and is the only child of said Blythe; that he was her father; that he was never married; that said Blythe, in his lifetime, in the state of California, by a certain instrument in writing duly made and executed, signed and subscribed by him in the presence of a competent witness, did declare: "That whereas I, the undersigned, Thomas H. Blythe, am the father of Florence Blythe, a little girl nine years of age last December, who now resides with her grandfather, James C. Perry, at Manchester, England; and, whereas, I am not married and have no family but myself and daughter; and, whereas, some question may hereafter arise, in case of my death, as to whether or not my daughter, the said Florence Blythe, is legitimate; and, whereas, I desire my said daughter Florence to inherit my property, and for that purpose, and to forever settle the question of her legitimacy, I do hereby make, sign and execute this document, in the presence of a competent witness, for that purpose, and I hereby certify and declare that the said Florence Blythe is my daughter and child, and the issue of my body; that I have always publicly acknowledged her as such, supported and treated her as if legitimate, and I now declare and acknowledge myself to be the father of said Florence Blythe, and declare her to be my daughter, and this instrument in writing is made for the

purpose of making her legitimate beyond question; and for the purpose of making her the heir of my person and body, that she may and shall inherit my property''; which instrument in writing was not, at the time of filing the complaint, in the custody or possession of plaintiff, and she does not know where the same is, and cannot procure the same; but states the substance and effect as fully, distinctly and clearly as it is in her power to do; and plaintiff avers that at various different times, and by other instruments in writing signed and subscribed by said Blythe in his lifetime in the state of California in the presence of competent witnesses, he did acknowledge the plaintiff to be his child and that he was her father; and that such instruments were made for the purpose of making her his heir, but plaintiff has not such instruments, nor any of the same, or any copy of the same, and for that reason she was unable to insert the same or a copy thereof in her complaint, and averred their substance on information and belief; that said Blythe, having no family, did, within the state of California, after the birth of plaintiff, and previous to his death, publicly acknowledge and declare her to be his own and only child and daughter, and did support, maintain and educate her as his child, and did otherwise treat her as if she were his legitimate child.

Subsequently plaintiff, by leave of court, amended the complaint (second amended complaint) by setting forth certain writings of various dates, signed and subscribed by said Blythe, by which it is claimed that he, in presence of a competent witness, did acknowledge plaintiff to be his child, and that he was her father. These writings, hereinafter to be referred to, are in the form of letters, and are known in the record of this controversy as Plaintiff's Exhibits 52a, 54, 61a, 68ab, which four letters, it is claimed, in and of themselves constitute an absolute and complete adoption of the plaintiff by the decedent.

In dealing with the evidence, the fact first to be ascertained is the paternity, and it must be established by plenary proof that plaintiff claimant sprang from the loins of Thomas H. Blythe, and was not the offspring of Joseph James Ashcroft, and the court will primarily proceed to the determination of this issue.

### THE PATERNITY OF PLAINTIFF.

The question upon the pleadings and proofs is: Was Thomas H. Blythe the father of this child, or was Joseph James Ashcroft? The inquiry is limited by the pleadings to this issue. I shall consider first the story of Mrs. Julia Ashcroft, as given in evidence in this trial, July, 1889, at which time she testified, in substance, that she was thirty-six years of age, born in Bristol, England; her father was James Crisp Perry; her mother died in 1876; in the year 1873 she lived in Upper Westbourne Terrace, London; first met decedent Blythe in Westbourne Grove; she was walking along on her way home, looking in shop windows; she noticed a man following her; he followed her a long way, and finally spoke to her; he asked her if she was admiring the things in the window; she did not answer him at first, and he spoke again; he asked her if she would allow him to walk with her; in answer to her question, "What for?" he said he had taken a fancy to her and admired her; they walked along Westbourne Grove, a street very much like Market street in San Francisco, a broad street with many shops or stores; they walked to the end of the street; she crossed to go home; he asked her to meet him again the next week, on a specified date, on a Friday, and he gave his name as Thomas H. Blythe. The first meeting was on a Thursday, 25th of February, 1873; the second meeting was on the Friday afternoon of the following week, when they took a stroll in Hyde Park for about an hour and had some ordinary conversation, Blythe expressing his admiration for her. Subsequently they met a week after that in pursuance of an arrangement between them to take a walk, which they did in the same park in the afternoon between 2 and 4 o'clock, at which latter hour she had to go home. These strolls with him in the park continued for about a month, and finally he gave her his address, Thomas H. Blythe, 10 Nothingham place, Marylebone, written on a piece of paper which he tore out of his pocketbook in her presence (Plaintiff's Exhibit 23), "T. H. Blythe, 10 Nothingham place, Marylebone." She saw him next on Sunday, March 16, 1873, at the address No. 10 Nothingham place, Marylebone, his place of residence. She found his room by this address: he had asked her to come and take lunch with him: she went and had some wine and

cake, and while there he seduced her under promise of marriage. After that she visited him, when he sent for her, about once a week. After she had been there once, when she left he would tell her to come again. One of the letters produced and marked Plaintiff's Exhibit 24:

"Tuesday, 10 P. M.

"My Dear Juliet: Having been out of town for the last three days, your letter came not to hand until this morning. I found it impossible to call upon you this afternoon, and it is not likely that I shall have an afternoon at my disposal during this week. Next week I expect to be more at liberty, when it will give me great pleasure to call upon you.

"With kindest wishes,

"Yours most sincerely,

"H. BLYTHE."

—which letter she received through the mail at No. 10 Charles street, to which place she had removed. There was no other Miss Perry residing there. She received other letters while there, one of which with its accompanying envelope she identifies as received through the mail (Plaintiff's Exhibits 25 and 25a), which reads as follows:

"Monday, June 23d.

"My dear Juliet: Should you not be specially engaged tomorrow, Tuesday, please drop in with a view to joining me in a glass of wine and cake; shall be at home at 2 P. M., and will be much pleased to see you.

"With kindest wishes,

"T. H. BLYTHE."

She fulfilled the request contained in this letter, went to 10 Nothingham place and found there Mr. Blythe and had cake and wine with him. She recognized another envelope and letter in the handwriting of the deceased, which she received through the mail (Plaintiff's Exhibits 26 and 26a); letter addressed Miss Julia Perry, 10 Charles street, Knightsbridge, reading as follows:

"10 Nothingham street, July 26, 1873.

"My Dear Julia: I expect to leave town this afternoon, and remain away until Tuesday, so you will please not to come to-

morrow. I shall be at home to-morrow week, August 3d, and shall be very much pleased to see you.

"With much affection,

"THOMAS H. BLYTHE."

She went to see him on the 3d of August in compliance with the suggestion in that letter. Another letter she recognized as in his handwriting which she received through the mail at 10 Charles street, Plaintiff's Exhibit 27a, which letter is as follows:

"10 Nothingham place, August 23d.

"My Dear Julia: I will call upon you on Monday next about 2 o'clock P. M. I have been confined within doors for the last twelve days owing to a bad cold and influenza of the eyes—inflammation I guess it is—or should have called earlier.

"With much affection, dear Julia,

"T. H. BLYTHE."

Blythe called upon her in pursuance of the statement in that letter, at 10 Charles street, Knightsbridge.

She recognized the handwriting of another letter of decedent received through the mail, inclosing a card photograph (Plaintiff's Exhibit 28a and 28b), the envelope (Plaintiff's Exhibit 28) superscribed, "Miss Perry, 10 Charles street, Knightsbridge"; the writer had promised her a photograph and she reminded him of it and he sent her this (Plaintiff's Exhibit 28b) in pursuance of that promise; this was a photograph of Thomas H. Blythe; the letter is as follows:

"August 27, '73.

"My dear Juliet: At your request I inclose a photo. With kindest affection,

"T. H. BLYTHE—in great haste."

Another letter and envelope she recognized as in his handwriting, received by her through the mail (Plaintiff's Exhibit 29 and 29a), addressed to "Mrs. Wilmot, 10 Charles street, Trevor square, Knightsbridge, London," the letter reading:

"San Francisco, January 25, 1874.

"My Dear Julia: Your letter announcing the arrival of the little stranger came safe to hands, and I am glad to learn you got over your trouble safely. Enclosed you will find one-half

of a ten-pound Bank of England note; on receipt of your letter acknowledging the receipt of the same I shall send you the other half. The amount I first proposed to give you can depend upon receiving. Send more details in regard to baby, etc., in your next letter. With kindest regards to your mother.

"With best wishes,

"Yours most sincerely,

"T. H. BLYTHE."

Every time she met Blythe they cohabited and the result of that cohabitation was the birth of a girl child, Florence Blythe, on the 18th of December, 1873. Witness testified further that during the year 1873 she had no connection with any other man than Thomas H. Blythe. Two weeks after the child was born she wrote a letter to him, to which Plaintiff's Exhibit No. 29a was an answer, addressed to Pioneer Hall, San Francisco. The substance of the letter was that a daughter was born, and the time of the birth; she had told him while he was in London that she was with child in April, 1873, at her mother's house, and he said in the presence of her mother he was very sorry he got her into this trouble, but he was going to marry her; he wrote on a piece of paper the name the child should have; the paper is the one marked Plaintiff's Exhibit 30 and 30½, and reads (Plaintiff's Exhibit 30):

"Mrs. Wilmot:

"Vernon Wilmot (if a boy).

"Flora (if a girl).

"T. H. BLYTHE."

PLAINTIFF'S EXHIBIT 30½.

Pioneer Hall,

San Francisco, California.

The name "Mrs. Wilmot" was the one he wished her to go by until he married her; she cut the address off (Exhibit 30½) to conceal it from her husband, Ashcroft; all of it was written at the same time, the first time that he came to her mother's house; he was there three times; he said he would marry her before he went to California, but business called him away and he then said he would marry her on his return, before the child would be born; she called the child "Flora"

for short, but she was baptized by the name of Florence; there was in the letter (Plaintiff's Exhibit 29) a half of a ten-pound note, as stated therein; when Blythe left England he left £20 for her with her mother, and told her to get the best doctor she could, but he would be back in time for the birth; she received through the mail the envelope and letter marked Plaintiff's Exhibit 31, 31a, addressed to "Mrs. Wilmot, 10 Charles street, Trevor Square, Knightsbridge, London"; letter dated March 19, 1874, as follows:

### PLAINTIFF'S EXHIBIT 31A.

San Francisco, March 19, 1874.

My Dear Juliet: Inclosed you will pleas find the other half of the note. I am glad to learn that both yourself and young mademoiselle are doing well. Have baby's photo taken and send me a copy in your next letter. Kindest regards to your mother and best wishes for yourself.

Very sincerely,

T. H. BLYTHE.

The Plaintiff's Exhibits 2, 3, 4, 5, 6, 7 are photographs of the plaintiff Florence as a child; the letters and envelope marked respectively Plaintiff's Exhibits 32, 32a, 33, 33a, 34, 34a, 35, 35a, 36, 36a she recognizes as in the handwriting of Blythe, addressed to "Mrs. Wilmot, 88 Church street, Chelsea, London," and were received through the mail by her at that address; she had moved from Charles street. These letters are as follows, in the order of their succession:

### PLAINTIFF'S EXHIBIT 32A.

San Francisco, June 1, 1874.

My Dear Julia: I hereby inclose you one-half of another ten-pound note and will send the corresponding half upon the receipt of your letter acknowledging the receipt of this half. My return to England is as yet undecided, but I shall continue to send the yearly allowance in this way for the present.

With kindest regard to your mother and hoping baby and yourself are well, I remain very sincerely,

T. H. BLYTHE.

### PLAINTIFF'S EXHIBIT 33A.

San Francisco, August 4, 1874.

My Dear Julia: The baby's photo came safe to hands. Of course I cannot tell whether it is a good resemblance of her or not. I should like to have another photo taken of her as soon as convenient.

Inclosed you will find the other halfs of the two notes.

Business matters will detain me here some time longer, and hence am not able to say when I shall return to London.

Remember me very kindly to your mother and kiss baby for me. With kindest wishes,

T. H. BLYTHE.

### PLAINTIFF'S EXHIBIT 34A.

San Francisco, November 26, 1874.

My Dear Juliett: Inclosed you will find a five-pound note, which makes one pound less than the full year's allowance. The future remittance will be forwarded as heretofore. I have not yet decided as to the time of my return to London. Send another photo of little Flo, kiss her for me and accustom her to say papa instead of "dad." Kindest wishes to yourself and mother. Very sincerely,

T. H. BLYTHE.

### PLAINTIFF'S EXHIBIT 35A.

San Francisco, March 10, 1875.

My Dear Julia: Inclosed you will please find a Bank of England note for ten pounds sterling, which I hope will arrive safe.

I am a little disappointed at not receiving another photo of little Flo. I hope you will not disappoint me in your next letter. I have been very much occupied with important matters of late, and am not yet able to say when I shall start from here for London.

Give my kind regards to your mother and kiss little Flo on my account, and with kindest wishes for yourself. Most sincerely yours,

THOMAS H. BLYTHE.

## PLAINTIFF'S EXHIBIT 36A.

Blue Jacket Mining Company,

Superintendent's Office,

Blythe City, Nev., Dec. 4, 1875.

My Dear Julia: Not receiving an answer to the last remittance sent, I concluded that something unexpected had happened; and were it not for very untoward circumstances that called me where I now am, I should have been in London months ago to see to affairs personally. I happened unfortunately to be the President and principle owner in the above-named mine and Compe. The mine has always been supposed to be very rich mine; but some how or other, through bad management by successive Superintendents, things have not been doing well for the last ten months. Under the circumstances I concluded to come up my self and examine things personally. This is the eighth week since my arrival here. Your letter was sent here after me. I do not expect to get to San Francisco until after Christmas. When I get there I will send to you a remittance; I cannot do it from here. This is a small town (named Blythe City in compliment to myself), some 7000 feet above the level of the sea. It is situated in the State of Nevada, thirty-four hours by rail, and then over two days, at this time of year, by stage. It commenced to snow here on the 27th October, and it has snowed about $\frac{2}{3}$ of the whole time since. Kiss little Flo, and give best regards to your dear mother. Very affection yours,

THOMAS H. BLYTHE.

Witness further testified that her mother died January 19, 1876, and she wrote to Blythe to that effect, (and Plaintiff's Exhibit 37a), a letter was received by her through the mail in reply:

## PLAINTIFF'S EXHIBIT 37A.

San Francisco, March 14, 1876.

Dear Julia: My return here was delayed much beyond the time expected when I last wrote you. Your letter announcing your deep bereavement, in the death of your dear mother, has been received. Accept my kindest sympathy and condolence in your great loss. The envelope you inclosed in your

letter with your address is as follows: "Mrs. Wilmot, 96 Great Ancoats street, Manchester, London." The same address is at the head of your letter. But at the close of your letter it is "Mrs. Wilmot, 96 Great Ancoats, Manchester." Of course there must be a mistake somewhere, and therefore I did not think it prudent to send you money to either of the addresses for fear it would have been lost. Upon receipt of this send me the correct direction at once and I will remit to you by return of post. I send two copies of this letter—one to "96 Great Ancoats, Manchester, England," and one to "96 Great Ancoats, Manchester, London," as it is on the envelope, in the hope that one of them will find you. With kindest wishes,                    THOS. H. BLYTHE.

P. S.—Be sure that you send the correct direction this time.

The enclosed envelope was addressed in mistake "Manchester" instead of "London," owing to her being worried on account of her mother's death at the time she wrote, and she put "Manchester" for "London": the "London" on an envelope inclosed to him had no business to be there; she received the letter and envelope marked "Plaintiff's Exhibit 38, 38a," through the mail at Manchester; the envelope was addressed "Mrs. Wilmot, 96 Great Ancoat street, Manchester, London."

Plaintiff's Exhibit 38a is an almost literal copy of Exhibit 37a, foregoing.

The letter (Plaintiff's Exhibit 39a) was received by her through the mail inclosed in an envelope, the superscription of which was in her handwriting: "Mrs. Wilmot, 27 Judd street, Euston Road, London, Eng.," to which place she had moved from Manchester. She sent the envelope inclosed in a letter to Blythe, to which this was a response:

### PLAINTIFF'S EXHIBIT 39A.

San Francisco, May 15, 1876.

My Dear Julia: Inclosed please find a twenty-pound note. I expected long ere this to be able to visit England this fall, but have to abandon all such hopes for the present. Possibly I may be able to come over early next year; until then you will please to use your own judgment as to little Flora and

consider that her yearly allowance from the first of the month is to be at the rate of thirty pounds sterling. The various enterprise in which I am now engaged taxes my time and strength to the very utmost and I require a change and rest. Lots of kisses for Flora and kind wishes for yourself.

Very truly yours,
THOS. H. BLYTHE.

There was a twenty-pound note inclosed in that letter; she received through the mail the letter, Plaintiff's Exhibit 40a, inclosed in an envelope addressed: "Mrs. Wilmot, 16 Sidmouth street, Gray's Inn road, London, England," both in Blythe's handwriting:

## PLAINTIFF'S EXHIBIT 40A.

San Francisco, February 5, 1877.

My Dear Julia: Inclosed please find a bank-note for 10 sterling. Upon receipt of an acknowledgment I will send you another of the same amount, accompanied with explanations for this long delay. Send a photo of Flo if you have a late one. I am well, but dreadfully overworked. Too many extensive enterprises to managed. Lots of kisses for Flo and kind wishes.          Very truly,

THOS. H. BLYTHE.

She was married at the time she received this letter. She received through the mail the letter and envelope, both in Blythe's handwriting, inclosing a ten-pound note. This is Plaintiff's Exhibit 41a:

## PLAINTIFF'S EXHIBIT 41A.

San Francisco, June 4, '77.

My Dear Julia: Your letter of the 4 March, including the photos, was received safe. Thanks for the photos, and believe that I am glad to learn that yourself and Florence are well. Inclosed please find a ten-pound Bank of England note, upon the receipt of which you will please drop me a line in acknowledgment. Business matters still continue so paramountly pressing as to render my prospects to visit England in ap-

pearance, at least, as remote as they were twelve months ago. Kiss Flo for me and accept kind wishes yourself.

HARRY BLYTHE.

In like manner she received the letters (Plaintiff's Exhibit 42 and Exhibit 43), the envelopes to which she thinks were lost:

### PLAINTIFF'S EXHIBIT 42.

724½ Market St., San Francisco.

Dear Julia: I have received no answer to my last letter, and being a little uncertain about matters, I have enclosed only a five instead of a ten-pound note. Let me hear from you at once, and in future address my letters to my office, 724½ Market street, San Francisco, California. I hope both yourself and little Flo are well. Kiss her for me. Write by return and I will send you the balance of the money. With kindest wishes,

THOS. H. BLYTHE.

724½ Market street, San Francisco, California, U. S.

### PLAINTIFF'S EXHIBIT 43.

San Francisco, October 13, 1877.

Dear Julia: It is very strange I do not hear from you. I begin to question now if some one here has not written to you and misinformed you of something. If you have received a letter from any one here send me the letter right off and address in future as I instructed in my last letter—to Thos. H. Blythe, 724½ Market street, San Francisco, California, U. S. A.

The letter (Plaintiff's Ex. 44a), inclosed in an envelope (Plaintiff's Ex. 44), she received through the mail, addressed to "Mrs. Wilmot, 21 Holden street, Shaftesbury Park, Wandsworth, London, England," where she was then residing:

### PLAINTIFF'S EXHIBIT 44A.

724½ Market Street, San Francisco,
November 19, 1877.

My Dear Julia: Your letter of the 28th of September came safe to hands. I was up in the mountains on business when

it came or would have answered sooner. I enclose in this letter, which I purpose to register, two five-pound Bank of England notes. I will send you more very soon. Tell me how much money it would require to get you a millinery shop. I will try to aid you get one by and by. Hoping yourself and Flo are well, with kindest wishes,

Yours truly,

THOS. H. BLYTHE.

Kiss Flora for me.

There were two five-pound Bank of England notes inclosed in this letter; the letter and envelope (Plaintiff's Exhibit 45 and 45a) were received by her through the mail at the address on the envelope, "Mrs. Wilmot, 52 Union street, Plymouth, South Devon, England," her father's address, where she was at that time:

### PLAINTIFF'S EXHIBIT 45A.

San Francisco, 724½ Market St., July 23, 1878.

My Dear Julia: Your last letter, without date, received. I am glad to learn that yourself and Flora are well. There are here in San Francisco a gang of swindlers who have for the last twelve months been trying by conspiracy together to do me great mischief, and I have been informed that they have written to you making some kind of propositions. I requested you in one of my letters to let me know what they had written to you, and for you to send their communication here to me. You never complied with my request. I have not written to you oftener for that reason. Enclosed you will find two ten-pound Bank of England notes, and it will be last I shall send you unless you comply with my request and let me know what those people wrote you, and also send their communications here to me.

Your            THOS. H. BLYTHE.

In this letter there were two ten-pound Bank of England notes; she thinks she received another letter, but is not sure; the last time she saw Blythe was August 24th or 25th, 1873.

She did not communicate to her father the fact that Florence had been born because she did not like to; she went to Manchester about a week after her mother's death and left

Florence in charge of Mrs. Sarah Bailey, the nurse; afterward came to London and went to her father's house—he was there with his housekeeper, Miss Kate Beadle, who afterward was married to him; they were all together for two or three weeks or more; the child was with them; the father of the witness, James Crisp Perry, was a vender of patent medicines; she remained with him in different places of business until she married Joseph James Ashcroft; the child was not with her all the time—she was with Mr. Perry the best part of the time, was with her occasionally; her husband was cruel to the witness and beat her and was dissipated, and she thought it better the child should stay with Mr. Perry; her husband did not like Florence; he knew that she had the child before she was married; the witness recognized Plaintiff's Exhibit 18, letter and envelope, as in her handwriting—envelope addressed "T. H. Blythe, Esq., 724½ Market street, San Francisco, California"; letter as follows:

### PLAINTIFF'S EXHIBIT 18A.

36 Dorset Street, Portman Square, London,

April 6, 1880.

Dear Mr. Blythe: I am very much surprised at your not answering my letter. It is now two years since I had any money from you, and I have your letter where you promised to allow me 30 pounds a year, and I hope you do not intend to stop it, as you know that Florry is a big girl now and I cannot afforde to keep her, and I shall have to put it into my solicitor's hands, Mr. Blythe, if you do not send, as you have no reason to stop it, and I do not wish to give you any trouble if I can help it. I have not been able to send Florry to school, as I have not had the money to do so. Florry sends her kind love to papa and would like to see him. Hoping this will find you quite well, Florry and myself are both quite well.

Please answer by return of post, as I am badly in want of money. With kind regards, I remain, yours truly,

MRS. WILMOT.

Address—Mrs. Wilmot, c/o Mrs. Ashcroft, 36 Dorset street, Portman Square, London, England.

Witness testified that she wrote that letter because her husband made her do so; he stood at the table with a stick in his hand and said he would beat her if she did not do it; he wanted the money; he was too lazy to work; he went with her to the postoffice to see that she put it in; the letter is registered early in May, but she could not account for that; she put it in the post the next day; the card photographs (Plaintiff's Exhibits 2-7) were taken after the child left her; she recognized them as pictures of Florence; her husband's full name was Joseph James Ashcroft; his mother's name was Mrs. Ellen Ashcroft; her daughter was Nellie Ashcroft; witness' husband was of light complexion, hair dark, eyes blue; she is not sure about color of eyes; first knew her husband's mother before marriage; went with him to see Mrs. Ashcroft; knew Samuel Webb and wife; think they lived above her on Dorset street; knew George James Shiells, a little, not much, and his wife; he was introduced to her by her husband; this was not in 1872; she was perfectly confident of that; he was not introduced to her as a distinguished foreigner; her husband merely said, "Mrs. Ashcroft, Mr. Shiells"; she did not then inquire where he came from or who he was; she never told Mr. or Mrs. Shiells that Flora was Jo Ashcroft's child; never told Mrs. Ellen Ashcroft that the child's name was Flora Kahn, and that she was the child of Kate Beadle and her father, Mr. Perry, who was then going under the name of Kahn; he used to do business in that name; she never told Mrs. Ellen Ashcroft, between 1877 and 1880, that Jo was the father of Flora, nor did she say that to anyone else at any time or place; the name that was given at the registration of the child's birth was Flora Blythe; "Flora" is the short name for "Florence"; she did not see the child from 1880 until after Mr. Blythe died; the child was with her father, living in Manchester; her father did not write to her during that period, and she did not write to the child or to her father during that time; was not present when Florence was baptized, nor was she notified or requested to be there; the child was not known after her marriage by the name of "Flora Ashcroft"; in the year 1876 the mother of witness died, and in the latter part of that year she married; at the time of the writing of the letter dated April 6, 1880 (Plaintiff's Exhibit

18), Florence was living with her; she referred to the child in that letter as "Florry." Flora and Florry are the same as Florence; the handwriting on the reverse side of the paper (Plaintiff's Exhibit 23) was written by her, "Sunday, March 16, 1873," "Friday, March 21, 1873"; those were references to appointments made with Mr. Blythe; with reference to Plaintiff's Exhibit 24a, she wrote asking him to come and see her mother; he got her into that trouble; he had promised to marry her, and it was right that he should see her mother; the name "Mrs. Wilmot" was originally suggested to her by him at 10 Charles street, in presence of her mother; he said he had got her into that trouble, but he was going to marry her and everything would be all right; he said he would marry her before the child should be born; she did not say anything at all when he wrote down the words "Vernon Wilmot" (on Plaintiff's Exhibit 30); did not make any demand that the marriage take place immediately; she thought he was right and she left it with him; he told her not to worry, that he would marry her, and she thought that that was sufficient; she thinks she explained to Jo Ashcroft about the child in August, 1876, at 16 Sidmouth street, Gray's Inn road, London; he was employed by her father in the evenings, writing; she told him that Florence was a little girl she had by a gentleman in San Francisco, and gave his name as "Thomas H. Blythe"; there was present in the room a girl servant, Miss Hazel; when she visited his rooms, March 16, 1873, she did not know more about him than that he was a gentleman, and that he said his name was Thomas H. Blythe; she thought she had a right to go to his rooms, as they were engaged to be married; never visited a gentleman's rooms before; he promised marriage first, and the act was accomplished under promise of marriage; he told her at the time that he had no relations; she wrote to him every time he wrote to her; she always asked him when he was coming back; she thought that that was sufficient; he understood what she meant; she always sent nice letters to him; she never mentioned Florence's birth to her father before her mother's death; she did not like to tell him, but told her mother, as she thought it was right to tell her, she being a woman; she had a half-brother in London; did not say anything to him or his wife about the affair;

she did not tell her half-brother's wife that she was engaged to a gentleman, and was about to be married; this half-brother's wife was Sarah Bailey; she was the nurse who was present when Florence was born; witness was nineteen or twenty years old when she met Blythe; she spent most of her life in London; she did not go much into society, was very quiet; had no young lady friends; sometimes conversed with the landlady's daughters at 10 Charles street; the landlady had three daughters; the family of witness belonged to no church or society, but occasionally went of a Sunday evening to some Protestant church; Mr. Blythe gave her an engagement ring on the Friday after he seduced her; it had an inscription, "From Harry to Julia"; it was a turquoise set around pearls; she lost it, do not know where; it came off with her glove; she told Mrs. Sarah Bailey (the nurse referred to) it was an engagement ring, also the landlady at 10 Charles street; it was on her finger, and when persons observed it she explained what it was; he never gave her any money personally before he returned to California, she never kept any account of the money he sent to her; she told Mrs. Webb, in Dorset street, that Jo Ashcroft was the father of the child to shield herself, as she did not want people to know about her affairs; but he was not the father; she had three children by him; she always treated Florence kindly while the child was with her, she loved her. The reason why she let her go to her father, Mr. Perry, was that her husband treated the child cruelly; he said he did not want to keep another gentleman's child; the corner was torn off the letter (Plaintiff's Exhibit 40a) to keep the address of Blythe from her husband, who had access to her letters in the drawers; she was never known by any other name or names than those she has given in her testimony; when her father sent money from the country he usually sent it by postal order; she has no likeness of her husband; she registered the birth of Florence Blythe herself; she gave the name of "Flora"; when she was married she was living with Mr. and Mrs. Perry; at her marriage there were present Mrs. Perry and David Davis; when she went to work in 1873, she received ten shillings a week; Florence was a full time child when born; she and Jo Ashcroft lived together as husband and wife six years continuously; kept house in a good many

places; moved about a good deal from place to place; lived in Wyndham street, when her husband died. This is in substance the story of Julia Ashcroft, as told on the stand.

How is this story borne out by other evidence in behalf of the issue of paternity?

The decedent, Thomas H. Blythe, at various times and to many different persons made statements after his return from England, and up to a time shortly prior to his death, confirmatory of the claim that he had had a female child born to him in England, in circumstances corresponding to those narrated by the witness, Julia Ashcroft, in her testimony; in fact, he never expressed a doubt that he was the father of this child except upon one occasion when, according to the testimony of the defendant, Alice Edith Blythe, speaking in conversation with her of some photographs of the child that he had received from England, he said he was pleased with the pictures and remarked that she looked as if she were well cared for, but with regard to a cabinet picture (Plaintiff's Exhibit 76), which he was in the habit of looking at and studying, he seemed much annoyed at the appearance of her mouth; said it was too large, that his mother had a small and pretty mouth, and he himself resembled her. He remarked also the limbs of the girl, and said that he himself had a well-turned ankle and rounded limbs, and that the girl was angular, to which response was made that that was natural at her age, as the girl was growing. (See judge's manuscript notes, volume 6, page 545, lines 12-21.)

It is claimed by counsel opposed to plaintiff (see abstract of argument H. E. Highton, Esq., page 804 of judge's manuscript notes, volume 9, lines 2-12) that no importance attaches to any declaration Blythe may have made after he left England as to being the father of the child, except as it arose from his own knowledge: Did Blythe himself actually believe—did he have a fixed belief—that he was the father of the child? And the same counsel claims that there is absolutely no oral evidence to that effect, only the statement of Julia Ashcroft, and she did not positively say he so believed, she only testifies to her communications to him and his responses, five letters or notes to her from Blythe, and not one word in any of them signifying that he believed himself to be

the father or that he had promised to marry her. And another of the counsel opposed to plaintiff (Geo. W. Towle, Esq., page 763 of judge's manuscript notes, lines 9-25, and page 764, lines 1-4, volume 9), after stating the uncontested proposition that, in dealing with the evidence, the fact of paternity must be established by plenary proof that claimant sprang from the loins of Thomas H. Blythe, says that plaintiff has produced but one fact—but one witness—in this behalf, Julia Ashcroft, and, he asks, Who is Julia Ashcroft? and answers, The child of James Crisp Perry, himself an illegitimate, a man whose long life has been devoted to fraud; and unite the instincts of the illegitimate Perry with the immoral Mrs. Perry, and what would be the result? That is answered, says this counsel, in the person of the mother of the plaintiff, as she was on the streets of London in March, 1873. What was she? asks the same counsel, and he answers: She had formed no female acquaintances to whom she dared refer; she had acquired no gentleman friends to whom she dared allude; she had been a member of no church; had no occupation; belonged to no society; visited nobody and received nobody of a reputable kind, so far as the evidence shows; and the evidence leads to the conclusion that from her fifteenth to her twentieth year she was engaged with her mother in plying a business which excluded her from intercourse with respectable society; it was physically possible for Julia at the time of her intercourse with Blythe to have been pregnant by some other man; and, says this counsel, every feature of this plaintiff runs to the Ashcroft family, not a single feature runs to Blythe.

The conclusion of counsel that Julia and her mother were street-walkers is unsupported by the evidence; and that she was a pure girl at the time she met Blythe was believed by him, according to the statements attributed to him by witnesses for plaintiff. In conversation with James E. Carr (see judge's manuscript notes, page 66, lines 2-23), Blythe spoke about children; witness had a little girl about eight or nine years old, and Blythe used to say how happy he would be if he had his little girl to play with her, in 1876; and again in 1879, one night at Blythe's office in San Francisco, or in a room adjoining his office, he talked about the child whom he called "Flo" or his "little girl"; he spoke of receiving a let-

ter from Dr. Perry, who said that the mother and her husband were not giving the child the benefit of the money he was sending; that Ashcroft was spending it for drink; Blythe said he wished he knew some reliable family who were coming out from England to bring her from Manchester, where she was living; he showed to witness the child's and the mother's pictures; he told the witness how he first met the mother looking in a show-window in Manchester, or somewhere, do not remember the place; he showed witness the picture of the mother, and asked him if he did not think she was good-looking, and asked if he found fault with him; witness said he did not, but asked him if in a case of that kind it was not doubtful, and Blythe responded, "No; there was no doubt at all in his mind about that part of it"; he said the mother was a virgin before he met her; he said he traveled and went around enough to know; that there was no doubt on his mind but what the child belonged to him; he did not doubt it at all; that the mother was virtuous, and he had promised to marry her and intended to fulfill it; that he had so promised before she consented; that always something occurred to prevent his returning to fulfill his promise; he told witness that the child was born soon after he left London. (See official reporter's transcript of evidence, volume 4, pages 1113, 1114, 1115, 1116, 1117 and 1118, substantially as in judge's manuscript notes.)

The decedent spoke to the witness, Varney, in 1875, for the first time about a little girl; he showed the witness a little picture, a representation of a child, a girl, about a year old. He said it was a picture of a little girl he had in England, the picture was on his table most of the time. Again, in April, 1876, he spoke to witness about his desire of going to England; he spoke of a woman, the mother of the child, whose name was Julia Perry; he said he believed he was the father of the child; he said her name was Florence. (Judge's manuscript notes, volume 1, pages 77, 83; official reporter's transcript, pages 1344, 1346, 1349, 1433, 1434, volume 5.)

Decedent talked to the witness Deasy in 1875, about a child; a girl named Florence, he said he had in England; in the early part of 1878, he showed this witness a photograph of a lady and a little baby standing on a chair like Plaintiff's

Exhibit 5, and he told witness that the child was his daughter Florence, and that the lady was at one time Miss Perry, and then she was married to one Ashcroft; he told that he knew it was his child; witness asked him how he knew; he said that he had made preparations for the child before he came back to this country; he told the witness of the story of how he had met the mother looking into a shop-window, and he related what followed with her; he said he knew she was in the family way before he left London. (Judge's manuscript notes, page 86, volume 1; official transcript, pages 1511, 1512, 1535, 1560, 1563, 1564, volume 5.)

Decedent spoke to witness, Mrs. Sarah L. Deasy, in 1877, about a child he had in England; this was during the Nellie Firmin trouble; he said if he were through with his troubles he would go to England and bring her here; he handed witness a picture, and said, "That is my child Florence, whom I spoke to you of," and then he related all that took place when he met the mother of the child in England, that he followed her from window to window; he said her name was Julia Perry; he followed her and got her to speak with him; he invited her to his room, ordered wine and cake; he volunteered to tell witness about the matter, and he said that the child, whose picture he showed to witness was the fruit of that meeting. (Judge's manuscript notes, page 96, volume 1; official reporter's transcript, pages 1671, 1674, 1675, 1677, volume 6.)

To Milo Sydney Jeffers decedent said that he had a child in London, that it was a girl. (Official reporter's transcript, pages 1753, 1754, volume 6.) He spoke of having a child; he said there was a child born in London, and that he was the father; her name was Florence; he always spoke of her by that name; the first conversation was in 1874; he last spoke of her on the last day of his life, at about 4 o'clock; he said to witness: "You will have to go and get Florence, for I never shall be able to go." Witness said: "I will go at any time, provided you give me two weeks' notice"; this was April 4, 1883. (Judge's manuscript notes, page 99, volume 1.)

To Montgomery Godley, agent for the estate of John Parrott, deceased, the decedent said one day while they were walking along Third street, in San Francisco, that he had a

child in England whom he had never seen, and that he was going to make some provision for her out of his property on Market street; this occurred about a year before he died; he said it was a girl, an illegitimate child; he said he was going to provide for her out of that part of his property west of Brooks street. (Official reporter's transcript, pages 1852-1855, volume 6; judge's manuscript notes, page 106, volume 1.)

To Thomas Drake Mathewson he said he had a little girl in England, and showed some letters that she wrote to him; he said her name was Florence. (Judge's manuscript notes, page 106, volume 1; official reporter's transcript, page 1859, volume 6.)

To Luman S. Pease, accountant for the estate of John Parrott, deceased (see official reporter's transcript, page 1881, volume 6), in conversation with him in 1881 at his office, 724½ Market street, he spoke of a child he had in England, born out of wedlock, whom he was educating and to whom he should leave the bulk of his property. (Judge's manuscript notes, page 108, volume 1.)

The witness, George Mairs Perine (official reporter's transcript, page 1889, volume 6) met the decedent in 1875 or 1876, in the office of the witness' father, N. P. Perine, with whom Blythe had some conversation, in course of which the elder Perine said to Blythe that he ought to take life easy and not worry about business affairs nor involve himself in large and complicated concerns, since he had no one to take care of but himself, Blythe responded that he had a little daughter in England, whose name was Florence, the elder Perine said that he himself had a daughter whose name was Florence. (Judge's manuscript notes, page 109, volume 2.)

To John King Luttrell, with whom he had conversations on various subjects, he said—one occasion in the early part of 1883—that he had a daughter in England; that he had been a "live" man in his day; he said her name was Florence; he often called her "Flora"; he was educating her and intended to provide for her. (Official reporter's transcript, page 1994, volume 7; judge's manuscript notes, page 117, volume 2.)

To Frederick Holland Reed, civil engineer, employed by decedent in 1882, Blythe said he had a daughter in England

named Florence. (Official reporter's transcript, page 2234, volume 8; judge's manuscript notes, page 126, volume 2.)

To Charles Nathan Palmer he mentioned the fact of his having a little girl in England, of whom he thought a great deal; her name was Florence, and she was in Manchester (official reporter's transcript, pages 2282, 2283, volume 8); had more than one conversation with him; one in particular was on one morning—Sunday—on Dupont street, now Grant avenue; he was looking at the new building occupied by the "City of Paris," and asked witness if he admired the architecture, and he said he was going to build another like it on the Market street corner; he said it was all for his little girl in England; this was in 1878; he said the name of the little girl was "Florence"; he said sometimes "Flo"; he said it was "all for his little girl." (Judge's manuscript notes, pages 129, 130, volume 2.)

George S. Irish, who was engaged by him to take care of his San Diego lands, was present on one occasion in 1881, late in the evening, when, after some talk about other matters, Blythe was seated at his desk, and he turned around and took out of a safe, or whatnot or chiffonier, a photograph of a little girl, and laid it on the table and said to witness, "That is my daughter, a picture of my little girl"; he said her name was Florence, and that she was in England, and that her grandfather had charge of her. (Official reporter's transcript, pages 2293, 2298, volume 8; judge's manuscript notes, page 130, volume 2.)

To Morris M. Estee, lawyer, whom the decedent consulted with reference to a sale which he contemplated of the east half of the block, which was not consummated, the decedent went into ecstasies about his enterprise in Mexico; witness advised him that at his time of life he ought to be curtailing his ventures instead of branching out, and also advised him not to sell his real estate here, to which Blythe answered that the west half was enough for him and his; he told the witness that he had an illegitimate child in England, a daughter, whose name was Florence; he said he never would sell the western half of the block; he said he had fixed up his affairs and had made provision for her; this conversation took place in the office of the witness Estee only two days, or a few days,

before Blythe died. (Official reporter's transcript, pages 2321, 2322, volume 8; judge's manuscript notes, page 132½, volume 2.)

To Thomas Francis Palmer (a former tenant in the Blythe block for several years immediately prior to decedent's death), Blythe said in one of many conversations he intended to build up the west side of Brooks street and reserve it for his little girl Florence. At another time, speaking of the Colorado river lands, he said he intended making there a home for himself and his little girl; and again, while he was standing talking with witness in front of 724½ Market street, a lady with a little girl passed, and he said, pointing to the girl, "That girl must be about the size of Florence"; this was about 1880 or 1881; the little girl looked to be five or six years old; he often spoke of her; he said she was in England.

Here we have repeated oral declarations on his part showing that Blythe had a fixed belief that the child was his offspring, made at different times and in various places up to within almost the hour of his death; and some of these witnesses cannot be, and have not been, accused of interest or bias of any kind in this controversy. It has not been suggested from any source that the testimony of Godley, Mathewson, Pease, Perine, Luttrell, Charles Nathan Palmer, Estee or Thomas Francis Palmer was tainted in any manner; others have been, with more or less appearance of cause, severely criticised, but these named have escaped censure, and against their general reputation nothing has been hinted or insinuated.

Let us now turn to what is offered in the way of writing in support of the issue of paternity.

### THE STORY OF JULIA ASHCROFT.

The story of Julia Ashcroft as to their first meeting is consistent and credible; the memorandum (Plaintiff's Exhibit 23), "T. H. Blythe, 10 Nothingham place, Marylebone," was written originally by Blythe, and subsequently when it became worn, written over by another hand; the testimony of the expert Gumpel as to this exhibit is wholly unsatisfactory, if intended to prove that the original underwritten words were not in Blythe's handwriting, and is, moreover contra-

dicted by expert Hyde. (Official reporter's transcript, pages 5997-6000; judge's manuscript notes, page 332, volume 4; official reporter's transcript, pages 5454-5471, volume 17, judge's manuscript notes, pages 308, 309, volume 4.) In my judgment, after repeated and close examinations of this writing I am convinced that the original name and address was written by the hand of Blythe, and that the statement of Mrs. Julia Ashcroft in regard to it is truthful (official reporter's transcript, pages 81, 82, 83, volume 1; judge's manuscript notes, page 6, volume 1); and that their first meeting and intercourse was at this address on the 16th of March, 1873; the letters, plaintiff's 24a, 25a, 26a, 27a, 28a (hereinabove incorporated in the abstract of Julia Ashcroft's testimony), are all consistent with her story.

The paper (Plaintiff's Exhibit 30 and 30½) written by Blythe in the circumstances related by Julia Ashcroft in April, 1873 (judge's manuscript notes, page 9, volume 1), shows that he believed and that he had a right to believe that he was the father of the child. Here in his own undisputed handwriting are the directions as to the naming of the child (Plaintiff's Exhibit 30):

Mrs. Wilmot:

Vernon Wilmot (if a boy).

Flora (if a girl).            T. H. BLYTHE.

## PLAINTIFF'S EXHIBIT 30½.

Pioneer Hall,

San Francisco, California,

—and the letter, Plaintiff's Exhibit 29a, is in further substantiation of his belief that the child was his; when he left England he gave to Julia's mother twenty pounds for anticipated expenses; when the birth was communicated to him he replied inclosing a remittance:

"San Francisco, Jany. 25, 1874.

"My Dear Julia: Your letter announcing the arrival of the little stranger came safe to hand, and I am glad to learn you got over your trouble safely. Enclosed you will find one-half of a ten-pound Bank of England note. On receipt of your letter acknowledging the receipt of the same, I shall

send you the other half. The amount I first proposed to give you can depend upon receiving. Send more details in regard to baby, etc., in your next letter. With kindest regards to your mother. With best wishes,

"Yours most sincerely,

"T. H. BLYTHE."

The subsequent letters from San Francisco are confirmatory of the statement of Julia that Blythe promised to return, although they are silent on the subject of marriage, promise 'or intention; while they lack ardor of expression, they are not devoid of concern for mother and daughter.

PLAINTIFF'S BAPTISMAL NAME.

In about a month from the birth of the child she was registered by the mother (Plaintiff's Exhibit 269, certificate of registry of births) by the name "Flora Blythe"; she was born December 18, 1873, a fulltime child, registered January 23, 1874; the name of the child is given as "Flora Blythe," and the name of the mother, "Julia Sophia Crisp Perry"; father's name and rank blank. The child was baptized according to the express written wish of Thomas H. Blythe (Plaintiff's Exhibit 52a); and nothing could more strongly evidence his faith in his fatherhood than this letter:

PLAINTIFF'S EXHIBIT 52A.

San Francisco, July 15, 1881.

My Dear Mr. Perry: The Graphic received with thanks, which reminds me of a duty unfulfilled. It is not easy to explain in a letter the real why of this delay, and particularly when the question of dear Flora's christening was involved. The postponement seemed to run from day to day, thinking the following morrow would bring more time and strength. I look at the proposed baptism of dear Flora as a matter of very deep importance. After full deliberation I think it best to have Flora brought up in the Episcopal Church, Church of England. You will therefore please have my daughter christened at once and have her named after her father—Florence Blythe. Although myself a skeptic as to orthodox Christianity, yet I believe in one Supreme and that

man mentally is a triune made up of moral, intellectual and religious elements. The non-action of either of these factors, and the human becomes inhuman. Probably the words ''Devotional Deism'' will approximately express my religious views. If my child had been with me I should most likely have brought her up in my own faith; but as things stand I shall be perfectly satisfied to have her brought up in the Christian faith as taught in the Church of England, with its sublime devotional service.

Neither do I wish that her tender mind shall be troubled by any doubts on the question of faith—let her hope be full, calm, unclouded, and serene. Faith in the Hereafter, no matter how arrived at, is a condition necessary to the right solution of the problem of being.

The other photo I long ago promised shall be sent by this mail. I owe you many apologies for this delay. My health is now better than it has been for some time. With my best love and a great many kisses to my dear little Flora and very best wishes for yourself and Mrs. Perry and hoping you are all well, Very truly yours,

THOS. H. BLYTHE.

The child was baptized according to his wish, as indicated in this letter, Florence Blythe (certificate of baptism, Plaintiff's Exhibit 69). The suggestion that the Perrys violated the English statute in statements at the time of baptism cannot alter the fact of paternity; their offense should not operate to the injury of an innocent party.

The Plaintiff's Exhibit 67a, a letter written about a month before his death, is important to show that not a shadow of doubt had crossed the mind of Thomas H. Blythe about the paternity of the child. Envelope (Plaintiff's Exhibit 67) addressed Florence Blythe. Letter is as follows:

### PLAINTIFF'S EXHIBIT 67A.

San Francisco, February 26, 1883.

My Own Darling Child: I cannot tell you how happy it made papa to feel upon learning that the health of darling Florence was improving, and was also very glad to know that your birthday passed off so pleasant. Would it not have been

nice if papa just dropped in on the jolly little party and joined in all the fun? I am sure it must be very nice to have birthdays, with such good grandpas and grandmas around to make nice presents. Papa also had a nice present—it was a nice silk handkerchief, and hemmed by his own little darling daughter. The hemming was pretty good for a beginning. Papa thinks that it so nice for little girls to know how to sew. Yes, you can bring your pansy cart with you to the Colorado river. Cousin Alice is going to take Bob and Squint there. It is good exercise for you to play with Pussy in the lawn. There is hardly an evening but what papa plays with Bob and Squint with a little switch. Our cats are very well-behaved cats, especially when meals are being served. They hardly ever move during meal hours. When papa sits down to tea in the evening Bob will watch so quiet until the meal is over and then, if papa takes the evening paper to read, Bob still remain quiet, but as soon as I throw the paper off my hands Bob then begins his maneuvers to coax a play and never gives it up until he wins. Five minutes play and he is satisfied for that evening. Cousin Alice is one of those who cannot get a good photograph of themselves. She has not a single photo that fairly represent her. She will try again and I will have her to send one to her cousin far away. She will also write you and tell her little cousin about the addition to our household—one little dog. One mocking bird (sent her by Mr. Andrade from Guaymas, Mexico), and also six fowls, who have to live on the top of the roof. Alice had for some time been in dire tribulation to get papa real fresh eggs & so at last she concluded to get the fowls. Papa leaves again for the Colorado river, Mexico, he will only be away from here this time about two weeks. Papa would like to hear from his little child very often. If papa does not write often it is because he has so much to attend to. I tried to write you this letter during the day, but could not do it, as business matters were constantly being present to me and I had to come to the office in the evening & have further postponements. Papa sends all his love to his darling child with a ship load of kisses, Florence papa.

THOMAS H. BLYTHE.

The letter, Plaintiff's Exhibit 68b, envelope (Plaintiff's Exhibit 68a) addressed "Florence Blythe," inclosed in exterior envelope (Plaintiff's Exhibit 68) directed to "Mr. H. Beach, 11 Bridge street, Deansgate, Manchester, England," mailed as per postmark at 1 o'clock P. M., April 3, 1883, a few hours before his death, is almost a dying declaration of paternity. The letter is as follows:

### PLAINTIFF'S EXHIBIT 68B.

San Francisco, Cal., April 3rd, 1883.
To Florence Blythe—

My Dear Child: Papa returned to San Francisco ten days ago in excellent good health. I felt a little disappointed in not finding a letter from darling Florence on my return here. Papa, you know, is very anxious about his darling little child health. I hope to hear soon that your health is better. After a little business matter is arranged here I shall return to the Colorado river again, and remain there this time about six weeks, or thereabouts. Give papa's kindest regards to your grandpa and grandma, with earnest hope that they are in good health. With papa love to his Darling Child

THOS. H. BLYTHE.

This letter, Plaintiff's Exhibit 54, his first to the child, he having prior to that time always written to the Perrys, was written with evident care and precision, different from his own ordinary hand, which was rapid and somewhat difficult to decipher, and is worthy of attention, as establishing his belief in paternity. It is as follows:

### PLAINTIFF'S EXHIBIT 54.

San Francisco, October 21, 1881.
My Darling Child You have made your papa very happy by writing to him your dear little letter. I have read it over and over often, and find it very well written for a little girl, and very glad to find you have made so much progress. But I feel very sad to learn that my own dear child had been so sick with the whooping cough, and her papa not being near to comfort and help her. But your grandpa and grandma are so good, and that is a great comfort to me, for they have

done, and will do, all that can be done for their dear little grandchild. You say you "wonder when you shall see your Dear Papa." Well my dear child it is about like this, your papa for the last few years has had great many things to attend to and almost every evening on leaving his office he is very much tired with too much thinking about business and things; but he hopes to be able to sell off and get clear of most of these business work very soon; and when he does he will come to Manchester to see his Dear child and her grandpa and grandma. After that your papa will leave San Francisco for good and go to live on a large farm on the Colorado river, near the head of the Gulf of Cortes, in Mexico, and have dear Florence with him always. When we get there we shall have plenty of horses and cattle and chickens and doves and ducks and turkeys and all kind of birds; and I shall take all my dogs there too; and take my great big St. Bernard dog named "General Grant," and I know when you see "General Grant" you will like him so and he will love you so much. I tried to write you this letter in the day, but so many people coming in all the time I had to give it up and I came down to the office this evening so as not to make more delay. "General Grant"—I call him "Grant"—sleeps in my private office at night, and he is now lying at my feet while his master is writing his first letter to his own Darling Child far away. People say that "Grant" is the handsomest dog on this Coast. One word more. I should like my dear daughter to write to her papa a letter once every month. It need not be a long one, but just a little letter to tell me what you have done during the month, and what progress you make, particularly in your Music. I am very fond of music, although I do not play myself; and you can also tell me about the health of your dear grandpa and grandma, and other things besides. May God bless you, my dear child. From your loving Father

THOMAS H. BLYTHE.

In this connection other letters to the child may be inserted at this place.

One dated January 4, 1882 (Plaintiff's Exhibit 57b), inclosed in an envelope (Plaintiff's Exhibit 57a), addressed "Florence Blythe," within an exterior envelope (Plaintiff's Exhibit 57), addressed "Mr. H. Beach, 11 Bridge street,

Deansgate, Manchester, England," postmarked "San Francisco, Jan. 3, 1882, 7 P. M.," containing two maps (Plaintiff's Exhibit 57c and 57d), reads as follows:

## PLAINTIFF'S EXHIBIT 57B.

San Francisco, January 4, 1882.

My Own Dear Child: Your last dear and affectionate letter, also photos, Christmas card of good wishes and the kisses, were received the day before Christmas. They were the source of great pleasure to your papa. The photos are very good and the sentiments on the card are very beautiful. I am sure you fully realize how good your dear grandma and grandpa are to you in dressing you so nice and cosy. The photos and the Christmas card are together on my table before me, so that I can see them every day. The kisses I keep locked up in my heart. It is curious, but they all come so warm and snug all the way from Manchester. None are lost, and they are as sweet as sweet can be. Now about Grant—I have told him all you said, but he did not speak back, but only looked up into my face as if he wanted to say that he did not understand all perfectly, but kind of thought that it was all about a little girl and her Dolly, who were far away in Manchester. Anyhow, I told him if he would be a good dog and patiently wait he should see his little mistress some day. The book on "New Colorado" was also received, and I looked over it in a cursory way. The "New Colorado" meant in this book is the State of Colorado, situated way up in the interior, on the grand central range of mountains called the Rocky mountains, a thousand miles away from the place where I intend making my home. This book is written in the morbid-extravaganza style—not for the purpose of giving correct and useful information, but simply to meet a demand made by a class of readers not high either in taste or thought. Some of the pictures may be true to nature, others no doubt are very extravagant. But the State of Colorado is certainly the roughest State in the United States. The section of the country where I proposed making my home is situated at the extreme northwesterly part of the Republic of Mexico, at the head of the Gulf of Cortes and from the head of the gulf running along the river Colorado, on each side of it, some

twenty miles in the direction of Yuma. We get to Yuma from San Francisco by train in thirty-two hours; then from Yuma to Port Isabel at the head of the gulf it is only sixty miles with level road the entire distance. Within the next few months I expect a railroad will be finished from 'Yuma to Port Isabel. I have not yet fixed upon the exact spot where I shall build my home. Our company own a very large tract of country from which I can chose. The land is very fertile and adapted to the growth of all semi-tropical fruit, etc., etc., such as oranges, grapes, lemons, sugar-cane, cotton, etc., etc. The climate is singularly healthy. I do not think there is a spot on the American continent so favorable for health. On the map inclosed you will find Yuma, Port Isabel and our company's lands marked with red pencil. Another time I will tell you more about the country which I purpose to end my last days. I had a photo of Grant taken about fifteen months ago, just taken after he had been washed, with his own collar in his mouth. He always carries his collar in his mouth until he gets dry enough to have it put on again. With all my love and affection, and may God bless my dear child. Your father          THOMAS H. BLYTHE.

P. S. Of course you will read this letter to your dear grandpa and grandma, and remember your papa most kindly to them.

PLAINTIFF'S EXHIBIT 59.

Another (Plaintiff's Exhibit 59) reads:

San Francisco, Febry. 10, 1882.

My Own Dear Child: I am very happy to learn that your health is fully restored. Please tell your grandpa that I am also very glad to find that his health is also restored; and then give my very kindest thanks to your grandma for the nice New Year's card she was so good to send me. Well, I suppose you expect your papa to feel very sorry for the misfortunes that befell your little dolls. But I do not see how I can feel so very sorry after all, when you tell me in the same letter that little Katie was going to have a brand-new head and the other little one was going to have a long dress to conceal the injured foot. The dolly's doctor must be very ingenious. I had eight dogs when I mentioned in my last let-

ter about taking them down with me to Mexico—four old ones and four young ones. The young dogs at that time were about four months old, and about six weeks ago all the young ones died within eight days of each other. I was very sorry to lose them, as they were just the kind of dogs I wished to have for the farm on Colorado river; that left me with only four—"General Grant," St. Bernard, large and powerful, weighing 155 pounds; "Fannie," a large greyhound; "Alf," greyhound, not very large, but powerful, and a perfect beauty. "Baron," black dog, not a white spot on him, and next in size and power to "General Grant." The very day I lost the last young dogs, Commodore Monasterio, on leaving here for the City of Mexico, presented me with another young dog, a water spaniel. Have not yet named him. So you see they are all large dogs and no tiny ones with curly hair among them. Perhaps you will like big dogs better than little ones after you get better acquainted with them. You know big dogs will always take care of little children. I shall be very much pleased to receive the socks you intend knitting for me. I think No. 10 will be the proper size. Of course there is no hurry for them, so you can take your time to knit them. The antimacassar will also be greatly treasured and will not be put to use until papa's darling child comes to live with him, so as to take care of it. I look forward to that time with great pleasure and will hurry business all I can to bring that day around soon. My birthday is the 30 July, and on my next birthday I shall be 60 years of age, and I should dearly like to have you with me on that day were it possible, but I fear it will not be possible, yet I cannot tell for certain. You asked me if there is any little pieces of music I would like you to learn. I am very fond of music, particularly sacred music. But my greatest favorite of all is a selection from the opera "Lurline" to the words, "Sweet Spirit, Hear My Prayer." Next comes "Pleyel's Hymn" and "Nearer, My God, to Thee"; also the grand "Old Hundred." After that I like best some of the old English ballads, such as "Auld Lang Syne," "Ora Lee" and "Old Folks at Home." I have been very much bothered by people coming into the office all the time while writing this letter. If you

cannot read it, ask grandpa if he will not please read it for you. Your affectionate father,

THOMAS H. BLYTHE.

PLAINTIFF'S EXHIBIT 61A.

San Francisco, May 16, 1882.

My Own Darling Child: There is an unfinished letter for you in the safe at Papa's office written about three weeks ago which would have been mailed to you the morning after it was written had not the Doctor ordered Papa to bed that very same evening. The Doctor said this morning that I can be out in three days. All the trouble was simply a slight attack of gout in the left foot. Will write again in three or four days. I am now writing this in bed, but Papa was afraid his dear child might feel uneasy at the long delay, so he thought it best to drop a few lines at once. Really the rest even in bed will be beneficial to me and I am sure when I get out of bed I will be in better health than I have been for some time. Give my very best wishes to Grandpa and Grandma and say that papa hopes Grandpa is now entirely recovered from his late serious illness. Hoping that your health is good. From your own loving Papa,

THOS. H. BLYTHE,

To Florence Blythe.          No. 6 O'Farrell St.

Another (Plaintiff's Exhibit 64a) reads:

San Francisco, October 27, 1882.

Florence Blythe, My Own Darling Child: Your last dear letter of October 1 came safe to hands. Papa is much pleased with the evidence there found of the nice progress you are making in writing and otherwise. I am also very glad to learn that my dear child is enjoying good health and having such nice time at grandpa pretty country cottage. Daily moderate exercise in open air, with hoop or ball, or at the skip, must be very beneficial to your health. Papa is also so glad to find that his little darling can play with her kitten on the lawn out of doors so much better than a play in the house under the most favorable circumstances. I am also glad to learn that his little darling is pleased with her new school and having a nice companion in Miss Maclennan. Tell

grandpa and grandma that papa wishes them all kinds of happiness in their nice little country home, and that he hopes that the change from town to "Holly Banks" will secure the restoration of grandpa's health. Papa's health has not been very good lately; after being relieved of the gout his arm and shoulder gave him some trouble, particularly in preventing him from his usual sleep at night. In every other respect papa's health is excellent. I expect to adjust business matters here so as to leave for the Colorado river in about eight days. I go there as a matter of business, but the change and comparative rest, I am satisfied, will be highly beneficial for me. It will take 34 hours from here to Yuma by rail. At Yuma the superintendent of the settlement will meet me and we shall drive down to Lerdo and Port Isabel in a fine thoroughbrace wagon. We could drive down in one day, if required, but we shall take two or three days, so as to see the country as we go along. On my return to Yuma I might go up the river to visit Mr. George S. Irish (my trusty and favorite aid), provided matters in San Francisco do not press for my return. I must not forget to tell you that we have had an addition to our family lately. First, "George Washington Cæsar Napoleon." He was presented to Cousin Alice by a friend of papa. When presented he was a little wee bit of the cunningest of Scotch terriers. We kept him in the house for a few weeks, but he grew and grew to be such a big little rascal (he would tease and bother Bob and Squint, then they would bite and scratch him, and there was ever so much fuss) so papa had to send him to the office yard with Grant and the other dogs. He and Grant became great friends and for a long time he slept under Grant's mane. The other addition is a canary bird four months old, and papa will tell you about him in another letter. The bird belongs to papa Darling.

With the deepest love and affection from your father, and lots of kisses.

THOMAS H. BLYTHE.

THE CLAIM THAT PLAINTIFF WAS THE CHILD OF JO ASHCROFT.

Let us now consider the evidence adduced in the support of the claim that plaintiff is the offspring of Joseph James Ash-

croft. It is alleged that Joseph James Ashcroft was the father of this child; and that the foundation of the claim set up in this action was a fraud and conspiracy on the part of the Perrys to impose Ashcroft's offspring upon Blythe. The fraud was primarily on the part of Julia to extort money from Blythe by making him ·believe he was the father of the child. This was her individual part of the fraud. The accusations of conspiracy are also against the Perrys, neither of whom had ever seen or been seen by him, and whose letters, in addition to those of Julia, induced Blythe to write his letters to them in which he accepted their statement of his paternity.

If it can be shown that there was no communication or access between Joseph James Ashcroft and Julia Perry prior to the time of her intercourse with Blythe, all this charge of fraud and conspiracy will fall, because the issue is narrowed by the pleadings to the two men, Blythe and Ashcroft, and no one else is in the remotest manner indicated. Mrs. Ellen Ashcroft, mother of Joseph James, testifies that she first saw the little girl early in 1877, in Swinton street, where her son Joseph and his wife lived; she went there on a Sunday, and said to her son when she went into the room, accompanied by him, his wife and her own two daughters, as the child who was standing by a window came out from behind a curtain, "Whose child is that? How much she is like Florrie," meaning her own little girl. Jo said, "Haven't I always told you so?" and Julia said, "It is Kate's child." No more was said of consequence. The child was in the room behind the curtains of the window, and she came from behind the curtain into the room. Next saw her later in the summer, when they brought her to the house of the witness. They asked her if she would let the child stay for a bit with her as she was in Mr. Perry's way. Had the child only a few days until they called to ask if she could keep her a bit longer. Witness told them she did not care about keeping Kate's child; Jo said, "It is not Kate's child, is it, Julia?" She said, "It is our child." Witness said to her, "Why didn't you tell me that before?" and Julia answered, "Because we did not like to." Witness had the child a long time after that, could not say how long, it might have been weeks and it might have gone into months; the next time the child was brought was on the

31st of October, 1877; the reason she recollects the date was because on that morning Percy Ashcroft was born; her son Joseph brought the child; she stayed until December, 1877; witness took her away in a cab to go to Plymouth to the Paddington railway station; there were in the cab her son Joseph, his wife Julia, the infant Percy, the child Florrie and the witness; the child was always called Florrie by Joseph and Julia; they passed by the "Sun Music Hall," and while passing, Jo said, "Julia, do you remember that place?" Julia said, "Yes, that is where we first met"; witness asked, "When?" Joseph said, taking the child on his lap, "That was before she was born" (referring to the original of Plaintiff's Exhibits 237 and 5); she accompanied them on the train and they went away; next saw the child Florrie early in 1878; Jo brought her back to her house in Battersea; there came with him his wife Julia, and the infant Percy; they all stayed for three weeks; Florrie could talk then; witness heard her speak to Joseph in the presence of his wife; the child always called him "papa"; when they were going to Southampton. witness remembered the child kissing him and saying, "I will stop with my grandma while you go"; she never heard her call him by any other word but "papa"; he always called her "Florrie" or "Flora"; the child always called witness "grandma," and called the daughter of witness "Aunt Nellie," and her sons William and Walter "Uncle"; Joseph always kissed Florrie when he came in and when he went out, and used to play and romp with her; the child had fair complexion, golden hair, light blue eyes; they went away March 25, 1878, to Southampton; Florrie was in witness' parlor in her house when her daughter Ada died; witness fetched the child Florrie back from Southampton about a month after that; she brought her back alone; her son Joseph had a kind of a little shop there, drugs she thinks; stayed a few days; Kate came while she was there and promised to give her a dress, and she gave a little black dress, which is the one worn by the child in the photograph (Plaintiff's Exhibit 237); the child remained with witness during summer of 1878, continuously; had exclusive charge of her during that time; her son Joseph then fetched her back to Southampton; did not have her again for about a year; a servant girl of Mrs. Perry's

brought her back alone; she had a letter (Williams' Exhibit 14):

## WILLIAMS' EXHIBIT 14.

Mrs. Ashcroft—Dear Madam: I have sent dear Flora to you as I do not know her Mama's address, and if you will take the dear darling you will be well rewarded for your kindness, as I will never see her want. Should you not keep her, if you will kindly send for Ashcroft to come to your house for her, as it is not convenient for dear Florry to stop with us at present. However, I hope you will see your way clear to keep her. With kind regards, I remain,

Yours truly,          KATE PERRY.

That was in November, 1879; she was with witness on her birthday, December 18th, 1879; she remained until after Christmas, 1879; Joseph took her away to the West End; witness did not think she had the child again, except for a day or so; the next time she came, Mrs. Kate Perry wanted to take her away for a holiday, but her son Joseph objected, and took her to his own home. Then Mrs. Perry wrote witness two letters which she wished her to forward to the mother of the child, and then Julia brought the child down again. Williams' Exhibit 15 is the letter from Mrs. Kate Perry.

## WILLIAMS' EXHIBIT 15.

March 21, 1880.

Mrs. E. Ashcroft: I thank you very much for posting Julia's letter. I have inclosed another if you will kindly forward it to her. All being well, I shall be in town on Tuesday and will call upon you on Wednesday noon. Hoping it will not inconvenience you and thanking you again for your kindness, hoping you are better, with kind regards to Miss Ashcroft and yourself, I remain,

Yours truly,          KATE PERRY.

Did not see Florrie again; Mrs. Perry took her away; the child had very light blue eyes, light eyelashes and eyebrows, light golden hair, fair complexion, thin lips, her nose nice and rather long, thin and straight, her face was rather larger then than this girl's (the plaintiff meaning, who was presented for purpose of identification, standing up with hat re-

moved); and the witness stepped from the stand to the floor beside the plaintiff, and in answer to the counsel, Dr. Edward R. Taylor, who said, "Now, Mrs. Ashcroft, I ask you to look carefully at the young girl standing before you, who is the plaintiff in this case, and state to the court whether or not you recognize her; look carefully at her"; whereupon the witness made a careful examination of the plaintiff's features, looked closely into her eyes, scrutinized her countenance, scanned her in all lights, took her by the shoulder and turned her round about, and with deliberation and in a positive manner answered: "I cannot recognize her; I cannot see a feature that I could recognize her by; I cannot recognize a single feature. She must have very much altered if she is the same girl that was with me; cannot trace a feature; don't recognize her." (Official reporter's transcript, pages 4004-4015, volume 13; judge's manuscript notes, page 234, volume 3.)

This witness was very precise and positive in denying the identity of the plaintiff at this point of her examination; she was afforded every opportunity to ascertain accurately the fact of identity, and answered without hesitation; she said the little girl she knew had a pink and white complexion, a round face with a sharp nose, was a perfectly healthy and robust child, one she should have expected to grow into a good-sized, healthy girl; and when the witness was requested by the court to describe the plaintiff as she stood before her (without any reference to the little girl when she last saw her in 1880), she said she would call her eyes dark gray, black eyelashes and brown eyebrows, brown hair, complexion not very fair; lips pink, rather thick; nose very nice, shorter than the little girl witness knew in England and rather thin; nostrils thin; mouth rather pouty; this girl has a very bad set of teeth; the other child had small, perfectly even teeth, she hadn't shed them then; this girl's teeth are short and uneven, and her face is long, not round; witness could not say that this girl is not the one she knew nine years ago; but she could not recognize her at all; witness could not say the girl is not the same person, as she was a little girl then, only six years old, turned seven, but the witness failed to recognize a single feature. The first time she saw this girl, the plaintiff, was about a fortnight before in the courtroom; witness came into the

courtroom one day and saw her come in and go on the witness-stand. (Official reporter's transcript, pages 4015, 4016, volume 13.)

Witness was in the room before Joseph died when Julia was there; he asked for a pencil to write, but he could not write, and he told witness in Julia's presence to tell Kate that it was not for love she took the child but for money. Before that he said they ought to be punished for taking his child away.

This testimony was offered and introduced in support of the defendant's hypothesis that the plaintiff here is not the child that was kept by the witness, Mrs. Ellen Ashcroft, and that if she was such child that Joseph James Ashcroft was the father and not Thomas H. Blythe. (Statement of counsel, Dr. Edw. R. Taylor, in making offer. Official reporter's transcript, page 4021, volume 13.)

Witness saw the paper marked "Wms. Ex. 16" before and received it through the post; this exhibit is as follows:

### WILLIAMS' EXHIBIT 16.

52 Union street, Plymouth, Jan. 9, 1878.

Dear Mrs. Ashcroft: I have sent per S. W. Railway a small box in which you will find a small cake that Miss Flora won at a lottery at Christmas; it is but a small present, but it is to show you that we appreciate your kindness to dear little Flo when she was in need of such. The dear little child often talks about her grandmama, and I am sure she has got every reason to be grateful to you and your daughters for your kindness and sympathy toward her, for it was a dreadful thing for Ashcroft to only be married a few months and to be in such a state of destitution as they were. Now I have furnished another home for them, and I give Ashcroft one pound a week and pay their rent, so if he will not try to do now I shall never do any more for them. Wishing you every success in your business, I remain, dear madam yours truly,

JAMES PERRY.

Mrs. E. Ashcroft: Dear Mrs. Ashcroft, I have inclosed in the box with Flora's cake a small tin of Devonshire cream and a bottle of cough mixture and hope your cold will soon

be better, and if yourself or daughters could make it convenient to come to Plymouth at any time I shall be very glad to entertain you. With kindest love from dear Flora and lots of kisses to her grandmamma and Aunt Nellie and Aunt Ada. Flo was delighted with the Christmas card which Auntie Nellie sent her. Hoping you are all quite well as it leaves Mr. Perry, Flo and myself. With love to yourself, Miss Nellie and Ada, I am yours faithfully,

KATE PERRY.

Mrs Ashcroft, witness, remembers a box in her house, which was used for Florrie's clothing—a tin box marked F. M. C. P.; she saw it in November, 1879, when Mrs. Perry's servant brought it to her; the box is now in the same condition; it is Williams' Exhibit 17; it was out of her house for awhile in 1881; she let her son William have it then, and he has had it ever since, and she is living with him; in 1883 Julia asked for the box; she said if she did not give it up she would make her; witness told her she would detain it for the maintenance of the child, and she went away very cross; she once told the witness that the initials stood for "Flora Maud Crisp Perry" (official reporter's transcript, page 4032, volume 13); witness failed to recognize the photograph (Plaintiff's Exhibit 231), and saw no resemblance in that picture to the child Florrie as she left her house in 1880; witness recognized Plaintiff's Exhibit 237 as a photo which she had herself taken of Florrie; the picture, Plaintiff's Exhibit 80, was the most like Florrie she had ever seen, the mouth resembles hers; Plaintiff's Exhibit 7 (card photograph) same as the other; Plaintiff's Exhibit 6 seems a little like Florrie; Plaintiff's Exhibit 8 is Florrie and Kate Perry; also, Plaintiff's Exhibit 77 is Florrie and Kate Perry; that is the nearest she has seen like her; Plaintiff's Exhibit 96, hair exhibit, is about the color of her hair in March, 1880, call it golden; Plaintiff's Exhibit 15, hair exhibit, is about the same; Plaintiff's Exhibit 78, photo, is Florrie; Plaintiff's Exhibit 256 is a picture of Florrie and Mrs. Julia Ashcroft; witness' son Joseph died January 10 or 11, 1883; she was not with him when he died, and does not remember what the doctor said he died of; he was in bed about two days; never heard the child "Florrie" called "Maud"; it was January 10 or 11, 1883, when her son died, but witness

does not remember at what hour; Mrs. Shiells was there when her son Joseph said it was not for the love of the child that Kate took her away, but to make money; witness did not understand what he meant, but thought it was to make a dancer or a theatrical of the child, or something of that sort. (Official reporter's transcript, page 4165, volume 13.)

The testimony of Mrs. Ellen Daniels, daughter of Mrs. Ellen Ashcroft, does not merit detailed consideration, as it is mainly corroborative of her mother, except in the particular that Mrs. Daniels said she believed that plaintiff is the "Florrie," of whom he spoke as the child of Julia Ashcroft.

When the witness, Mrs. Ellen Ashcroft, was recalled to the stand (October 8, 1889), a week after the time of her failure to recognize plaintiff, she said that she had seen her several times of late, met her in the City Hall elevator coming upstairs to the courtroom, and at the photographer's; she thought she noticed in her manner and voice something of the "Florrie" that was taken away in 1880, and as a result of these observations of late she recognized her as the same.

Witness produced a memorandum of agreement or contract, under the conditions of which she came to California to testify in this case. (Plaintiff's Exhibit 257.) A like memorandum was produced in connection with the testimony of her daughter. (Plaintiff's Exhibit 258.) The former was to receive one guinea a week, and the latter one pound, five shillings a week during the time they are detained as witnesses, dating from the time of leaving London, and their passages outward and return, and expenses of maintenance while so engaged. (Judge's manuscript notes, pages 242, 257, volume 3.)

### THE TESTIMONY OF GEORGE JAMES SHIELLS.

The testimony of George James Shiells is important, as it is designed to establish the time of the first meeting between Joseph James Ashcroft and Julia Perry. He testifies that he was born on the 1st of February, 1856, and after giving an account of his whereabouts and employment until 1873, says he worked in that year for Smith & Son, bread and biscuit

bakers, from July to December; in December, 1873, he went to work for Chalmers; from there to Oxford street, Linscott's bakery, and worked there about thirteen years, until 1888; first became acquainted with his wife in 1873 or 1874; married her in 1879; forgot the date; she was in Jacobs', Russell street, Covent Garden; have had three children by her; he did not remember the time of the birth of the first; the second, now living (October, 1889) is twelve years old; it must have been born in 1877; the first must have been born in 1876. Witness knew Joseph James Ashcroft; became acquainted with him in 1872, in Crown street, Soho; he was working in a pawnbroker's shop for a man named Lewis; witness and Jo Ashcroft were about the same age; he was fair, about the same height, not quite so stout (the witness' height as measured in court is five feet, five inches and almost a quarter); don't recollect the color of his eyes; they were light, his hair very fair; he was a very delicate man; his wife was much stouter than he by a long way; witness was introduced to him by a young fellow, whose name he cannot recall; Ashcroft and witness became intimate; used to go out a great deal to the theaters and music halls and places of amusement; used to go to Sunday-school together in Wandsworth road; not so often to Sunday-school as to music-halls; witness has here and produces letters written to him by Joseph Ashcroft, letters marked Williams' Exhibits 27, 28 and 29; two of these were received by witness, and one (Williams' Exhibit 27) by his father; those are the only letters witness retains that were written to him by Joseph Ashcroft; he had others, but they are destroyed or lost; the picture, Williams' Exhibit 2, is a picture of Jo Ashcroft. He is in the same Scotch dress referred to in the letter, Williams' Exhibit 27, which reads as follows:

## WILLIAMS' EXHIBIT 27.

80 Wandsworth Road, 1 Feb., '74.

Mr. Shiells—Sir: I was informed by my father that you called for the Scotch dress. That belongs to George. I took the Scotch dress out of pledge for 15s. ¾d. interest. I am

willing to give you the things if you will give me the 15s. it was in pledge for. I am myself very hard up, and can not afford to lose the money.

Yours obediently,

J. ASHCROFT.

Please answer this letter, and let me know how George is getting on.

Witness never saw that picture before now; it resembles him very much. The letters (Williams' Exhibit 28 and 29) read in evidence as follows:

WILLIAMS' EXHIBIT 28.

4 Islington Green, 1 March, '75.

My Dear George: I have written to Mr. Stuttle about you have you been trying to become a Christian if not do try. Ask Christ to forgive you your sins we know it is hard to give up our sins but if we wish to become respectable members of society we must try and serve the Lord who has set before us his commandments and we must obey them if we wish to be save  Now Dear George if you will let me know how much the man will let you have your overcoat for and if he will open the door and let you have it next Sunday morning I will get the money at least I will not pay the 10 off the watch I was going  I have bought another pair of trousers for myself which I shall bring on Sunday and you can have. You must tell me when you write if you can be at Rupert. St. 10 o'clock Sunday and we can then go and get the coat and we shall look respectable.  I shall then want you to go to Church with me you must not refuse or I will be greatly offended.  I have formed a scheme so that together with my Mothers help we shall be able to open some business but I must tell you all about that when I see you it would be too much to write now in fact I am waisting my master's time writing such a long one as it is but never mind I shall expect to find you of the same oppinion when I meet you next Sunday as when I left last time  I must now draw to a conclusion first giving you a warning.  Jesus says let naught of any description cause you in any one thing what or whatever insignificant to regret having made up your mind to follow him;

be a man George forsake all you companion who do you no
good give up the lusts of the Flesh and seek to become a lover
of the Lord and an inheriter of a seat in his everlasting king-
dom if not you are lost forever. With kind faithful and
Christian love I remain

Yours faithfully          JOSEPH.

WILLIAMS' EXHIBIT 29.

4 Rosamond Buildings,

Islington Green, 9 March, '75.

Dear George: Having promised to write to you, I do so now.
I have not received a letter from Mr. Stuttle, and I think he
must be busy, or he would have wrote. I have a great deal
to say to you in this letter. (The first I shall commence by
reproducing the conduct of that young lady of Sunday night.
It seems strange and factious to me; I really cannot under-
stand it. The complaint she has seems to me of quite a differ-
ent nature to what you represented it to me, as I must say,
George, that there are plenty other girls who could appre-
ciate a love that you can offer, but if you love her as I be-
lieve you do, I think that where there is love there ought not
to be such foolishness as fainting or fits. I fancy there are
more than that in it, dear George. Do not think that I say
this for any ill-feeling toward Jane, because I have not, but
I cannot say that I should regard her as a fit wife and par-
taker of George's joys or sorrows, for I think it would be a
sorry day to see you united. In fact, if this is the case be-
fore marriage, what the deuce will it be after? A sickly wife,
also consumptive children, a hard-worked husband and a com-
fortless home. What a picture! Pause, ponder, sift. Look
at the picture that I draw. Is it not one that would make a
heart bleed, if all was to come true that I say? Now for the
bright side of the picture. Let us both try and be more spar-
ing with our money, or we shall never have enough to open
business with. It would be a great speculation. It must be
properly considered by both of us, and I must endeavor to
let Stuttle know of the matter, and perhaps he will assist me
in trying to open a point of commerce under the name of
J. J. A. & G. S. Now, dear George, let me ask you if you

are any better in your faith? and keep Mr. Stuttle's words in your mind about a mother, think of his words, how kind and how loving, to picture a mother and child saying their evening prayers. I hope you have not forgotten this I am sure I have not. I quite repented of what we did after we left the class Sunday, it was not right of us, we ought to try and act upright. We are able now. Try and get up early next Sunday morning, and we will go to church. I know if you go once, you will always want to go, and then perhaps it will be the means of making you give your heart to the Savior. I went down on my knees and asked God to forgive me; try and do the same, dear George; let us try and live a Christian life, and then receive a crown of glory. Now I must finish; it is getting late; I have not sent the portrait of Agnes in this letter; I want to keep it till Sunday; I did have a lark with it, and made her so cross; how devotedly Emily loves me; I cannot tell you; any word from me she takes as law, and does it immediately, whatever it might be; but, George, I shall never have that love for her that I did have. I have told her so, but she says as long as I let her love and kiss me she is happy. But it does not make me happy to see her go on in this strain; I should rather see her resign to fate, and have the Jack that first made up part at all; she now sees her folly and wishes to make, but I will never let her. With kind Christian regard, I remain your affectionate brother and friend,                                     JOSEPH.

Excuse such a long letter. When I began I thought I should never leave off.                                 J. J. A.

At the time Jo got the Scotch suit he said he was going to see Julia Perry; witness first saw her while he was working at Smith & Son's; saw her off Gray's Inn road or Cromer street, near a public house called the "Silver Cup"; witness was with Jo Ashcroft, who took him to see her; they went there by mutual appointment; Jo said he was going to see his girl, and asked witness if he would like to go with him, and they appointed the time; Julia was alone on the first occasion; that might be in July, 1873; when they met they went for a walk; Jo introduced them in this way, "Julia," "George"; he did not use their surnames; they took a walk around the square; they were engaged in the walk about three-quarters

of an hour; can barely remember the conversation or that sort of thing; parted at the end of Cromer street; Jo and the witness bade her good-night, and each went to his respective place; next saw Julia at 16 Sidmouth street, where Perry, then going under the name of Kahn, was living; a person named Kate Beadle was living there and a servant in the house; witness went there with Jo in the evening about 8 o'clock, and saw Julia and the servant girl; they went out for a walk that night, witness taking the servant girl for a partner, and Jo with Julia; walked around the squares; were about one hour and a half; Jo spoke to witness to make Julia believe that he could speak French; walked back to 16 Sidmouth street; witness parted with the servant girl and Jo went into the house with Julia; witness walked down to the corner of the street; waited there a quarter of an hour, and then went away. (Official reporter's transcript, page 4878, volume 15; judge's manuscript notes, page 284, volume 3.) Jo told witness on one occasion that he was always very fond of Julia, and no doubt some day he would make her his wife. Jo showed him at another time, afterward, a carte de visite of a baby in long clothes; this was about 1874, outside of the shop in Oxford street; on another occasion Jo told him that his mother had taken it out of his pocketbook; next saw Julia in 1874 or 1875, would not be certain which, when they came up to witness' house on Gilbert street to ask witness and wife to go to their wedding; witness said he might be mistaken in the date; am positive that it is that date; they were to be married on Christmas night; it was a week or a couple of weeks before Christmas that they called to invite witness and wife to the wedding; witness was not at home at the time, but his wife was, and told him; he was at work at Linscott's, Oxford street, at the time; he did not go to the wedding, because he was unable, being late at work (official reporter's transcript, page 4882, volume 15; judge's manuscript notes, page 284, volume 3); afterward, in about a month or six weeks, witness and wife and child by invitation went to visit Julia and Jo, and found there, in Holden street, Shaftesbury Estate, Mrs. Ellen Ashcroft and a little girl called "Flo" and "Florrie"; Jo asked witness how he liked his little girl, and witness told him that he thought she was a nice little girl;

he and Jo took a walk, went to the nearest public house; witness chaffed Jo a little about the baby, and Jo turned "nasty" with him because of the chaffing; witness did not know that Jo had a child before marriage, and Jo intimated that it was none of his business, or words to that effect; heard the little girl call him "papa" and Mrs. Ellen Ashcroft "grandma." After this occasion witness did not see Jo and Julia again for a considerable time, until they came to live in Crawford street. Witness was still working at Linscott's, and Jo was engaged with Lewis Davis. This was in 1881 or 1882. Jo and Julia came to the residence of witness, and stayed about three-quarters of an hour. There was no particular conversation that he remembers, and nothing about Florrie on that occasion. Next saw them in 18 John street, Edgeware road; cannot remember the date; witness is uncertain about dates (official reporter's transcript, page 4887, volume 15; judge's manuscript notes, page 285, volume 3); witness had no means of fixing the time; he said that Kate had taken the child away under pretense to buy her some clothes, and if he did not get her back it would be the death of him; he referred to that subject again on his deathbed, and often before at their various meetings; he died at 16 Wyndham street, close on to midnight, in 1882 or 1883, will not be sure which. Down to the time of Jo's death, witness never heard the name of Blythe; never heard the girl called Florence Blythe; never heard anything further about her, nor about who her father and mother were, than what he has already testified. (Official reporter's transcript, pages 4889, 4890, volume 15; judge's manuscript notes, page 285, volume 3.)

### DEATH OF JO ASHCROFT.

Witness was present the night Jo Ashcroft died; he asked for his little girl "Flo" or "Florrie"; he asked for his wife Julia, and she came to his bedside, and he asked where "Florrie" was. Julia said, "I don't know." I said, "Can't you find her? Have you no means of finding her?" She answered, "No; I have no money." He asked, "Can't you borrow some?" She said, "No," and he said, "I wish to see the child before I die." She replied, "You can't, because I don't know where she is." That is all Jo said at

that time; afterward witness was left with him alone, and he said, "Julia, my wife, is pregnant, but not by me." He asked for a piece of paper and a pencil, and he tried to write, but did not succeed; he said, "George, don't cry for me; I shall not be here long." At that time the wife of the witness was present, and he said, "Well, George, this is the last of me; I don't know what will come of my wife and poor Florrie," or "poor Flo," "and the other children," and the rattles then set into his throat, and he said no more. (Official reporter's transcript, pages 4914, 4919, volume 16; judge's manuscript notes, pages 286, 287, volume 3.) Prior to that, during the evening, Jo said to witness that he was badly bruised in the legs, that he had been kicked by Julia, had been jumped upon by her at the time they went to an evening concert at the club; that when they came out they had a few words, and she threw him down and jumped on him. Witness saw the body on the Sunday succeeding his death, in the same room, in presence of Mr. Peacock; looked at Jo's legs, saw bruises and showed them to Mr. Peacock. (Official reporter's transcript, page 4920, volume 16.)

Witness has a contract for compensation for coming to California (Williams' Exhibit 30) and a paper (Williams' Exhibit 31), which is the "deposition" or statement referred to in the contract. The statement was made in Liverpool, in the office of Herbert, Lewis & Davies, solicitors. Their clerk took it down. It was an unsworn statement; witness was introduced to Julia by Joseph Ashcroft in July, 1873; fixed the date of the introduction by reference to the "character," or recommendation given him by Smith & Sons; that "character," or recommendation, produced by witness and exhibited to the court, dated May 5, 1874, certifies that he has been in their employ from July, 1873, to December, 1873, and was trustworthy; it must have been July, 1873, that he first met Julia Ashcroft, "as near as possible"; three or four weeks after he went to work for Smith & Sons, cooks and confectioners, bread and biscuit bakers; never worked for them except during that time; Dr. Hood first suggested to him that he had better have the date of his employment from Smith & Sons, and to date his meeting with Julia Ashcroft from that time, and that he would be allowed to refresh his memory

from that paper, the "character"; Dr. Hood made the suggestion after witness made his first deposition, in 1883, at Mrs. Chapman's house, in Croydon street, which was after meeting Mrs. Perry, October 17, 1883; witness often talked with Dr. Hood, and he and the doctor would have a glass of ale together in the public house and have a chat together; Dr. Hood never told witness whom he represented; before that, witness conversed with a Mr. Chalmers, a solicitor's clerk; he sought witness out, and through him met Dr. Hood; first met Dr. Hood at Mrs. Chapman's, but is not positive; Dr. Hood said to witness that it was important that he should fix the date of his meeting Julia first in 1873, and if witness had any documents in his possession which would fix the date, to keep them; Dr. Hood did not tell witness why it was important; this conversation occurred at the "Red Lion" public house, in Duke street; thinks it was the second or third interview; witness will not be positive, because he had so many interviews with Dr. Hood; it may have been two weeks from the first time he met Dr. Hood; he cannot say exactly how long; it was some time before he gave the statement. (Official reporter's transcript, pages 5002-5016, volume 16; judge's manuscript notes, page 291, volume 3.)

Witness told Dr. Hood first of the dates of the various places at which he had worked before he had told him of his meeting with Julia; Dr. Hood told witness that it would be necessary for him to fix the dates of those meetings with reference to certain dates that witness had given him; in fixing the dates the witness had the assistance of Dr. Hood; witness can't exactly say what Dr. Hood asked him; witness told the doctor all he knew about Joseph (official reporter's transcript, pages 5020-5031, volume 16, judge's manuscript notes, page 292, volume 3); witness never saw a photograph like Williams' Exhibit 2 before he came on the stand; saw it in a newspaper; Williams' Exhibit 27 was received by his father and by him given to witness; he had it in his possession before his father's death; Joseph took the Scotch suit out of pledge where either witness or his father had put it in 1873, about twelve months before the writing of Williams' Exhibit 27. The exhibit, Williams' Exhibit 29, being handed to witness, he is asked, "Can you read that aloud?" and an-

swers, "No, because I may make a mistake or two." Witness, under direction of counsel, proceeds to read the letter (this is one of the letters that the wife of the witness testified had been read aloud to her daily, every day since August 20, 1889). (See official reporter's transcript, pages 4679-4702, volume 15; judge's manuscript notes, pages 270, 271, 272, volume 3.) Witness undertook to read this letter, but after proceeding with a part, the court directed him to desist from any further attempt; witness then said he did not read it exactly every day; did not remember when he first read it to his wife; was not sure whether it was before or after he met Dr. Hood; read it to her before he met him (official reporter's transcript, pages 5053-5066, volume 16; judge's manuscript notes, pages 291, 292, volume 3) ; those letters first came into possession of witness March 1, 1875, and have been there ever since, except one night at Haywards, when he let Dr. Hood have them; witness sealed them up and Dr. Hood put them into his safe; the names "Emma" and "Agnes" in the letter from Jo Ashcroft referred to girl friends of the witness named Butler; that was in 1875; witness was then working at Linscott's; went there somewhere in 1874; before that he was at Chalmers', in Little Ormond street; prior to that in Smith & Sons', in Lamb's, Conduit street; worked in Chalmers' only a few weeks; do not know whether Julia Perry's mother was living or dead at the time of first meeting with her; never heard her mention her mother; Jo told witness that Kate Beadle was living at 16 Sidmouth street at that time; Mr. Perry was then going under the name of Kahn; that was at the time Jo was employed at his place; witness cannot remember the year; do not know whether it was in 1877; can't exactly remember what date it was, or the year, when Jo was employed at 16 Sidmouth street; had some business with him then; witness says that one of the reasons why he remembers that it was July, 1873, that he first met Julia, was at that time he was cautioned by his employers for having remained out one night instead of coming to the shop; witness first knew Mr. Perry by the name of Kahn; first met Julia in July, 1873; second time was between 1874 and 1875, the third time was close on 1876; witness is certain of those dates; is not sure how old he was on first meeting Julia; he

was about twenty-three years old then (this was in July, 1873; he was born February 1, 1856) ; witness was sixteen or seventeen years old when he left the service of Baron de Tuyll; a year after that he met Joseph Ashcroft; and two years thereafter he met Julia; the witness says that he must have been twenty-one or twenty-two years old then, that was in 1873; he cannot fix the date of the occasion when Jo told him he was very fond of Julia, and that he intended to make her his wife; witness went from Smith & Sons in December, 1873, to the coffee-shop, but remained there only a day and a half, and while there got the ''character'' or recommendation; witness was a considerable time at home before he went to work for Chalmers; did not go direct to the coffee-shop to work after he left Smith & Sons; after the meeting with Julia in July, 1873, he could not venture to say how long it was before he met Joseph alone; sometimes they would meet by accident; sometimes they would meet every evening for several days in succession; sometimes weeks and months would elapse; sometimes a year; the certificate of character or recommendation from Smith & Sons was dated at London (Lamb's, Conduit street),. May 5, 1874, addressed to Mr. Frowd, 8 Russell street, Covent Garden (Williams' Exhibit, 32a) ; witness was present the night Joseph died, about the 10th or 11th of January, 1883, when Joseph spoke to witness about the paternity of the child of which Julia was then pregnant, the posthumous child; witness was alone with him; he said that his wife was pregnant, but that he was not the father of the child, and asked for a piece of paper on which to write the name of the man who was the father; witness took a piece off the margin of a newspaper, but Joe could not write; after this occurred, the wife of the witness came in, also Julia, and a person from above stairs; witness does not remember that Jo spoke on religious subjects on that evening (official reporter's transcript, page 5169, volume 17; judge's manuscript notes, page 297, volume 3). Witness repeated what Joseph said: He asked to see the child and asked where ''Florrie'' was, and Julia said she did not know; Jo asked, ''Can't you find her?'' Julia said she had no money. He said, ''Can't you borrow some?'' and Julia replied, ''I have no place to borrow any.'' Witness would not be sure that Jo stated that night that Dr.

Perry had the child and that Kate Perry had taken "Florrie," but not for love of the child, but to make money out of her. (Official reporter's transcript, pages 5169-5172, volume 17; judge's manuscript notes, page 297, volume 3.)

Witness first heard from Joseph James Ashcroft in 1874 that Julia Perry had had a child by him. Witness had previously testified that he did not know that Jo had a child before marriage, and Jo had intimated that it was none of his business. (See official reporter's transcript, page 4885, volume 15; judge's manuscript notes, page 284, volume 3.)

It is not deemed necessary by the court to collate the testimony of Mrs. Mary Jane Shiells, the wife of this witness, her story being subordinate to his narrative. As his importance as a witness, as has been observed, consists in establishing the dates of meeting between Jo and Julia, it may be well to consider the consistency of his statements.

### THE CONSISTENCY OF SHIELLS' STATEMENTS.

At the time the witness Shiells says he first saw her in 1873 (July), she was not living where he located her, but several miles from there, as the exhibits (letters from Blythe to Julia, hereinbefore recited) establish. The witness has adhered with unwavering pertinacity to the date "July, 1873," as the time at which he first saw her, and yet if there is one physical fact proved in this case, it is that at that time she was not in a condition to be walking about; she was then carrying her child.

Apart from the denial of Julia as to the time and circumstances of first meeting this witness Shiells, his testimony may be considered as it contradicts and falsifies itself. He says that Jo told him on one occasion that he was always very fond of Julia, and no doubt some day he would make her his wife, and that Jo showed him at another time afterward a carte de visite of a baby in long clothes. This was about 1874, outside of the shop on Oxford street. Witness' wife testified that about eighteen months or two years before his marriage to Julia, Jo showed her and her husband, at the latter's place of business, a photograph of a baby, and he said, "What do you think of my girl?" (Official reporter's transcript, pages 4520-4527, volume 14.)

Witness again testifies that in about a month or six weeks after the marriage of Jo and Julia, upon his visit to them, after Jo and he took a walk, he chaffed Joe a little about the baby, as he did not know that Jo had had a child before marriage, and Joe turned "nasty" with him about the chaffing, and intimated that it was none of his business.

Shiells testifies that he first formed Jo Ashcroft's acquaintance in 1872, when they were about fifteen or sixteen years old (page 4859, volume 15, official reporter's transcript); he first saw Julia Perry while working for Smith & Sons, between July and December, 1873 (page 4872, volume 15); next saw her at 16 Sidmouth street, between 1874 and 1875 (page 4876, volume 15); Jo and Julia came up to his house on Gilbert street, late in 1874 or 1875, would not be certain which, to ask witness and his wife to go to their wedding; witness said at first that he might be mistaken as to the date, and then he was positive that that was the date; it was a week or a couple of weeks before Christmas that they called to invite witness and wife to the wedding, which was to take place Christmas night (page 4882, volume 15); he says he is uncertain about dates (page 4887, volume 15); he repeats that he first met Julia in July, 1873 (page 4989, volume 16); the third interview with Julia Perry he locates about a week before they were married, in 1876, near Christmas time; he says he met Julia first in 1873, about two years after he met Jo (page 5081, volume 16); the third time he saw Julia was more than a year before the marriage (page 5119, volume 16); he first met Julia Perry in July, 1873; the second time, between 1874 and 1875, and the third time close on to 1876 (page 5121, volume 16, official reporter's transcript). Witness says he was about fourteen or fifteen years old when he entered the service of Baron de Tuyll de Serooskerken; worked for him for two years, was sixteen or seventeen years old when he left; witness first met his wife about two years after that, and was about twenty years old when he first met his wife, and became acquainted with Joseph Ashcroft about twelve months before, and a year after he left the service of the Baron de Tuyll; about two years after meeting Joseph Ashcroft, met Julia, and was twenty-three years old at that time. (Official reporter's transcript, pages 5126, 5127, vol-

ume 16.) Subsequently says this is a mistake; he must have been twenty-one or twenty-two years old when he first met her; he was born in 1856; he first met her in 1873. Witness does not exactly remember the date of Joseph Ashcroft's marriage; think it was Christmas morning, but will not be certain about that. (Official reporter's transcript, page 5259, volume 17.) Witness saw Joseph many times between 1874 and 1876. (Official reporter's transcript, page 5261, volume 17.)

The first time witness met Julia Perry was about the end of 1872, when, by appointment with Joseph Ashcroft, they went to meet Julia and another girl at a place which witness thinks was in Cromer street; when witness made this statement he said he was referring to the second time he met Julia Perry when he met the servant girl; witness explains this by saying that at the time Dr. Hood took that statement down from him witness had not got the other papers which he produced afterward to the doctor, and with that he gave him as near about the date that he had made was in 1872 instead of 1873; after he saw the doctor he fixed the date 1873, when he got another paper and looked this over.

He never met this servant girl and Julia with Jo but once. (Official reporter's transcript, pages 5262, 5263, volume 17.) Witness thought this meeting was in Cromer street; in 1873 he met her in Cromer street (page 5264, same volume), and in 1876, or somewhere about that time, witness met her in Sidmouth street. (Official reporter's transcript, page 5262, volume 17.)

Witness saw Julia and Jo by themselves at the first meeting—in 1873; the time he met Julia and Jo and another girl was in 1876; the first meeting they had was in 1873 and the second meeting was in 1876, the second at 16 Sidmouth street (page 5265).

Witness is positive he first met Julia Perry between July and December, 1873—somewhere about that time.

### IRRECONCILABLE STATEMENTS.

It is impossible to reconcile these contradictions, or to justify them on any theory consonant with the veracity of witness; his statements are not only irreconcilable each with the

other, but they are inconsistent with the testimony of other witnesses on the same side; he and his wife differ very materially as to dates, not agreeing even upon the birth and existence of their first child. (See official reporter's transcript, page 4704, volume 15; judge's manuscript notes, page 282, volume 3.)

Witness was born February 1, 1856, and says that when he first met Julia Perry he was twenty-three years old. This would make the year of meeting 1876. Subsequently he says this was a mistake, and that he was twenty-one or twenty-two years old when he first met her, in 1873. Of course if born in 1856 he would be about seventeen years and upward in July, 1873.

The letters (Williams' Exhibits 28 and 29) are important, as in conflict with the imputed intimacy between Joseph Ashcroft and Julia Perry prior to their marriage in March, 1876. Take the one of March 1, 1875. Is it credible that this letter could have been written in a spirit of sincerity by Joseph Ashcroft if he had had an illegitimate child? And moreover, to one to whom he had the year previous, in 1874, confessed his transgression? (Official reporter's transcript, pages 5240-5248, volume 17.) This is the letter containing religious advice and adjuring Shiells to seek forgiveness of sins, and concluding with a warning to George to be a man and to forsake all companions who do him no good, and to give up the lusts of the flesh, and subscribing himself "with kind, faithful and Christian love."

It is not probable that the writer of this letter had been at that time the begetter of a bastard, and the same may be said of Williams' Exhibit 29, letter of March 9, 1875, Ashcroft to Shiells.

It would be remarkable, if the writer and his correspondent were acquainted with her, that there is no allusion to Julia in either of those letters, although there are references to other girls, Jane and Agnes and Emily, the last named of whom Jo claims to be deeply enamored of him and to be happy as long as he lets her love and kiss him, although for some reason not clearly explained his own affection for her has abated. The inference from this correspondence is irresistible that at that time, March, 1875, Joseph knew not Julia.

It is clear that the witness George James Shiells was hopelessly confused as to dates when he tried to fix the date of his meeting Julia for the first time. His adherence to the date July, 1873, in spite of its irreconcilability with his other dates, and the statement of his age at the time (he said he·was twenty-two or twenty-three years old at the time, whereas in 1873 he was only about seventeen years of age, having been born in 1856) is difficult to account for except in connection with the contract and accompanying statement made to Dr. Hood prior to the witness' coming to this country to testify in this cause.

### THE DEPOSITION OF THE DAVISES.

Next in order are to be considered the depositions of the Davises—father and son.

David Davis, the son, deposes that at the date of the deposition he was twenty-nine years old and upward, that he knew Kate Perry, formerly Kate Beadle, and first saw her on the day of Joseph Ashcroft's marriage to Julia Perry, when he and she both signed the register as witnesses to said marriage, which took place in December, 1876, at a Baptist chapel, John street, Marylebone; he first knew Julia Perry from about the end of the year 1873, or the beginning of the year 1874, about which period Joseph entered the service of his father, Lewis Davis, in Crawford street, as a clerk; Julia was in the habit of calling at his father's offices for Joseph in the evening, upon the termination of his day's duties. Joseph entered his father's service about the end of the year 1873, and remained with him until about the year 1881; cannot recollect the exact period, was formally introduced to Julia by Joseph Ashcroft about two months before the marriage, but knew her by sight long before then; it·was in the evening, no one else being present but the three—Joseph, Julia and deponent; thinks Joseph introduced her as the daughter of Dr. Kahn and said she was his girl or sweetheart, or words to that effect; when Joseph entered the service of deponent's father at Crawford street, in 1873 or 1874 he was naturally never formally introduced to him; simply got to know him as he would any other clerk by seeing him at the office with the others; when Ashcroft first entered his father's employ deponent was assisting his father in his business as a valuer and Ashcroft

never worked for him personally, but for his father continuously from 1873 or 1874, the exact date he cannot now recall, until a few months before his death, with the exception of a short period when Ashcroft left his father's service, but was again taken back; witness cannot give exact dates that he entered or left, as he kept no memoranda of such matters, and is unable to answer more definitely. Very soon after Joseph came to his father's service deponent saw Julia hanging about the premises waiting for Joseph; deponent was not introduced to her then nor till long afterward, say two or three months; *it was about two or three months after witness first saw her that he was introduced to Julia by Joseph James Ashcroft.*

This deponent, David Davis, says he was introduced to Julia by Joseph about two months after witness first saw her, who said she was the daughter of Dr. Kahn; this was the year, as is testified that Perry was doing business at 16 Sidmouth street, as Dr. Kahn. (Judge's manuscript notes, page 310, volume 4.)

The testimony of Mrs. Ellen Ashcroft is that Jo went to Lewis Davis' shop, in Crawford street, in the latter part of 1876, and remained there until after he was married. (Official reporter's transcript, pages 4074-4075, volume 14.) Plainly, it could not have been in 1873 that David Davis, then a boy of about thirteen years of age, saw Julia and Joseph, and must have been in 1876. The Davises retained no books or memoranda by which they could refresh or verify their recollection. Lewis Davis, the father of David Davis, testifies that, judging from his appearance, Joseph Ashcroft was between twenty and twenty-three years of age when he entered his employment, which therefore must have been in 1876, as Jo was born in 1856.

Counsel in opposition to plaintiff's claim (Dr. Edward R. Taylor) contends that the depositions of David and Lewis are most important to show that Julia met Jo before 1876, and insists that they are conclusive as to that fact. In the judgment of the court, when they are analyzed, and in conjunction with other evidence for defendant, they are conclusive to the contrary contention.

### THE THEORY OF RESEMBLANCES.

While it was physically possible (as one of the counsel argues) for Julia, at the time of her intercourse with Blythe, to have been pregnant by some other man, when it is said that Joseph Ashcroft met Julia Perry and became the father of this child, he was between sixteen and seventeen years old, a callow boy, as is shown by his picture in the Scotch suit (Williams' Exhibit 2) and she a handsome young woman of twenty years, it is utterly unlikely, entirely improbable, that such a connection could have been or was formed, even if all the proved facts were not so strong against such an assumption. But it is said that there are certain resemblances between the Ashcrofts and the plaintiff, which, in connection with the want of resemblance to Blythe, argue the consanguinity with the former; and one of the counsel (Mr. Towle) has constructed upon this hypothesis a most elaborate, subtle and ingenious theory to show that Joseph James Ashcroft, and not Thomas H. Blythe, was the father of Florence; and another counsel on the same side (Dr. Edward R. Taylor) contrasts the two men—Thomas H. Blythe and Joseph James Ashcroft—the one a strong and vigorous man, the other a small, weak, consumptive, puny person, and notes the child's marked resemblance to the Ashcrofts, an extraordinary resemblance, says this counsel, which carries with it a power of persuasion which the court cannot readily resist; the features are identical, the facial points of identity strong, the same protrusion of the upper lip and the like contour of the countenance, and other elements of common derivation that have produced in the mind of the counsel a conviction that the plaintiff was begotten by Ashcroft, and not by Blythe; but it is curious how far the zeal of advocacy can carry counsel in advancing a theory or evolving a fact, for on the opposing side the counsel for plaintiff produces an array of dissimilarities about equal to the resemblances; but neither avails aught as against facts established in evidence; an ounce of fact outweighs a ton of theory, and in addition as to this character of evidence, it has been laid down by competent authority that it does not go far toward establishing relationship, since a marked similarity between strangers and great dissimilarity between kindred are matters of almost daily observation (In re Jessup, 81 Cal.

418), and it has been well observed by counsel (John H. Boalt, Esq.), for plaintiff, that no one here has ventured to suggest that there is any resemblance between the plaintiff and Mrs. Ellen Ashcroft, her alleged paternal grandmother, to whose evidence it is proposed now briefly to revert.

### MRS. ELLEN ASHCROFT, GRANDMOTHER.

This lady is extolled by counsel (Edward R. Taylor) for the defense as a good, motherly woman, who must by her appearance have commended herself to the court as a truthful witness, one who was fair all the way through (see judge's manuscript notes, pages 775-777, volume 9), a witness who must be believed by the court; and another counsel on the same side eulogizes her as "the noble, womanly, lovable grandmother." (Abstract of argument of Mr. S. W. Holladay, judge's manuscript notes, page 786, volume 9.)

Counsel opposing plaintiff (the senior Mr. Holladay) comments on the occasion when, after Jo and Julia were married, in 1876, the grandmother first saw Florence, and exclaimed, "How much like little Florrie!" alluding to a child of her own dead long before, a natural, impulsive exclamation of truth; and this counsel (Mr. Samuel W. Holladay) proceeds to say that it is in evidence that the child lived for a time with Mrs. Ellen Ashcroft, visited there frequently as a child, first as the child of Mrs. Kate Perry, but afterward confessedly as the child of Jo and Julia; she was Jo's first child, asserts Counsel Holladay, the first gush of his boyish passion. Remember how recklessly these women swore that the child was always called Florence, when here is the letter of Emily Hawkins, December, 1879, addressed to "My dear little Florrie":

### WILLIAMS' EXHIBIT 18.

111 Wandsworth Road, Dec. 18, 1879.

My Dear Little Florrie: I wish you many happy returns of the day. I hope you will come and spend another afternoon with us before you go home. I wish I could get Nelly sometimes to come and see us. Tell Nelly I shall be able to come on Saturday. I shall come as early as I can in the afternoon.

Hoping you are all well, also trusting to see you all soon. Give my kindest love to your dear grandma and Nelly, and the same your little self, not forgetting William.

I remain your affectionate friend,

EMILY HAWKINS.

Wishing you all a Merry Christmas and a Happy New Year.

What was the motive of the Perrys, queries counsel, in stealing this child? Why should they prefer Florence to the other children of Jo and Julia, who should have been equally dear to their grandfather Perry? Why did they steal and secrete this child? And counsel answers, that they might pretend that it was Blythe's child, and extort money from him through it by practicing this colossal fraud and conspiracy.

Jo Ashcroft, says counsel, was especially fond of this child, as was shown by his expressions at the time he died, and counsel traced, in his own way, the history and migrations of the Perrys, and here may be inserted appropriately "the history of the child according to Mrs. Kate Perry," as compiled by Counsel Dr. Edward R. Taylor, associated adversely to plaintiff with Mr. Holladay.

### HISTORY OF THE CHILD FLORENCE.

History of the child according to Mrs. Kate Perry: First saw Florence Blythe in London in March, 1876; went with Julia to Mrs. Bailey's, in the Brompton road, to get her. Perrys first went with child to Euston road, and then to 27 Judd street; then to 16 Sidmouth street until May, 1877; Florence remained at 16 Sidmouth street after marriage of her mother; next Perrys went to Ryde, Isle of Wight; here Florence went to her mother; at Ryde, from May to October, 1877; while at Ryde she (Mrs. Perry) went to London with Mrs. Elder, and saw Florence; next saw Florence at 52 Union street, Plymouth, in December, 1877, where the Perrys went from Ryde; she stayed with Perrys here until the spring of 1878; she then went with her mother to London, where she remained two or three months; next saw her in Southampton in the summer of 1878; then in Torquay in August, 1877, and until January, 1879, she was with the Perrys there; from Torquay to London, to Moore Park Row; Florence did not go

with the Perrys, but went to her mother; saw her again at Teddington (near London) in March, 1879; she was with Perrys there until June, 1879; Perrys then went to 16 Sidmouth street until November or December, 1879, when she went to the Ashcrofts; Perrys from Sidmouth street to Worcester for two or three weeks, and from Worcester to Manchester; saw Florence again March, 1880, at Mrs. Ellen Ashcroft's, in London; she then returned with Kate Perry to Manchester the same day; at Manchester Florence remained with the Perrys until June, 1883, when they came to San Francisco.

From June, 1883, to November, 1883, Florence with W. H. H. Hart at San Francisco.

(NOTE.—It will be observed that Mrs. Kate Perry makes no mention of herself, Julia and the child going to Egglestone in the fall of 1876, as testified to by the Beadles, and she limits Mrs. Ellen Ashcroft's care of the child to the one time in the fall of 1879.)

### SYNCHRONISMS AND ANACHRONISMS.

There is a significance, remarks Counsel S. W. Holladay, in the fact that when they went to Manchester Perry took the name of "Mr. H. Beach." This was about synchronous with the stealing of the child.

The synchronisms discovered by counsel in this evidence might well be placed in juxtaposition with the anachronisms in the testamony of the Shiells and Davis witnesses, especially Shiells.

Counsel says he does not pretend that Jo Ashcroft was a great man, but he was fond of his offspring and the son of a good mother, Mrs. Ellen Ashcroft, a dignified, honest, chaste, matronly woman—"motherly" is the word to use; and counsel then alludes to the deathbed scene in the cellar where he died, when Jo Ashcroft adjured his mother, Mrs. Ellen Ashcroft: "Mother, I want you to follow the Perrys and punish them for stealing my child," and she is here, claims counsel, pursuant to that purpose and her promise to her dying son; she nursed and reared this child for the first seven years of its life; it was the child of her son, and she has a natural affection for her grandchild, who was taken from her by

strangers, her mind perverted and her heart alienated. It would be hard to delineate a more pathetic picture than that drawn by counsel, or one in more painful contrast with the fact as appeared in that spectacle (to which he alludes), the sad scene when Mrs. Ellen Ashcroft was on the witness-stand and the child Florence came in to be recognized by her, and when she at first failed to identify her.

"This is another headland in this case," a very bold promontory, "to steer us to the haven of truth."

It is worth while to recall that sad scene in connection with counsel's description of this "motherly" old lady, who in 1876 instinctively identified the child when she first saw her, and with "the natural, impulsive exclamation of truth," cried out, "How much like little Florrie!"

### THE SCENE IN THE COURTROOM BETWEEN THE CHILD AND THE GRANDMOTHER.

The sad scene referred to took place in the courtroom on Thursday afternoon, September 26, 1889, when the plaintiff, being asked by Counsel Dr. Edward R. Taylor to stand up and confront the witness and remove her hat, did so, and the witness, Mrs. Ellen Ashcroft, stepped from the stand to the floor on a level with the plaintiff, and proceeded to make a most cool, calm, circumspect and critical survey of the girl. She examined her carefully, as instructed, peered into her eyes, turned her by the shoulder around, and viewed her in every light. It would be hard even for an expert employed for the purpose to make a more thorough or a more cautious physical scrutiny—all under the immediate observation of the court—and turning around the witness said, not with the "natural, impulsive exclamation of truth," but with deliberation and emphasis tinged with acrimony: "I cannot recognize her; I cannot see a feature I could recognize her by; cannot recognize a single feature"; and this was not the first time during the trial that Mrs. Ellen Ashcroft had seen the girl, for it appears that she had, about a fortnight before, surreptitiously observed her in the courtroom, when the plaintiff was coming into the apartment and going on the witness-stand. (Official reporter's transcript, pages 4015, 4016, volume 13.)

After the court had requested the plaintiff to leave the courtroom, the witness proceeded to describe the child whom she had at her house in 1880, and when the plaintiff returned to the courtroom the witness described her as she stood there before her, feature by feature, the color of her eyes, eyelashes, eyebrows, hair, complexion, lips, nose, nostrils, mouth, teeth, face, and repeated that she could not recognize a single feature that this plaintiff had in common with the little girl whom she had with her in 1880.

It is true that when the witness returned to the stand, a week subsequently (Tuesday afternoon, October 8, 1889), she said that meanwhile she had had an opportunity to observe the plaintiff more closely, and now noticed in her manner and voice something of the "Florrie" of 1880, and, as the result of these recent observations, recognized her as the same; but this afterthought could not destroy the effect of her evidence on the first day, but, on the contrary, it had a tendency to strengthen that effect; the first examination could not have been closer, and if this "motherly" lady had a grain of the maternal instinct counsel claim for her, it would have been asserted in unmistakable manner when her hand came in contact with the person of the plaintiff; that touch of nature would have proved her kin. When counsel exclaims that this motherly lady, Mrs. Ellen Ashcroft, is here pursuant to a purpose to vindicate her son, and fulfill her promise to him on his deathbed to follow the Perrys and punish them for stealing his child, it seems strange to the court that she should, after so ample an opportunity of observation and investigation, fail to recognize the offspring of the loins of her own son, her direct descendant. If she came in obedience to the solemn injunction of her dying son, she made a signal failure of her mission at the critical moment. The impression made upon the mind of the court by her appearance, demeanor and testimony was radically at variance with that which the counsel would seem to desire to convey. She came across the ocean to testify against a child whom she claims to be her granddaughter, and while so engaged she is compensated under the terms of a contract that binds her hard and fast to testify in her evidence in accordance with the outline thereof contained in her deposition or statement made before

leaving England, for a guinea a week and passage and expenses back and forth while so engaged. (Plaintiff's Exhibits 257, 258.)

When she surveyed the person of plaintiff in the courtroom, she betrayed not a spark of motherly emotion, so far as was discernible to the court; not a gleam of natural affection was visible in her eye as she gazed with steadfast look upon the girl before her; on the contrary, the witness appeared to be actuated by a hostile, if not a malignant, spirit toward the object of her scrutiny; her conduct, also, when the photographs of the child were presented to her for recognition was remarkable (see judge's manuscript notes, page 240, volume 3) and inconsistent with the position of defendants as to her relation to the child.

### THE SCAR ON THE CHILD'S ARM.

One point may have escaped notice with regard to the identity of plaintiff. The scar on plaintiff's arm. Mrs. Ellen Ashcroft says she first saw this scar in 1877; she asked Julia what scar that was; Julia said it was from a cinder falling out of the fire, and was done in her own mother's time; "in my mother's time," were the words Julia used. (Judge's manuscript notes, page 235, volume 9.) This is in contradiction of the testimony given by Mrs. Julia Ashcroft and by Mrs. Kate Perry, that the scar was caused by a cut on the sharp edge of a broken shaving-cup after the time of the death of the first Mrs. Perry; and their statement is confirmed by the expert evidence of two eminent surgeons, Dr. John F. Morse and Dr. Charles E. Blake, that the scar was not the result of a burn, but that it was an incised wound, and not a burn. (Judge's manuscript notes, page 332, volume 4.)

### "THE SUN MUSIC-HALL" INCIDENT.

The testimony of Mrs. Ellen Ashcroft as to the conversation that she says occurred in 1877, in the cab, when she, her infant Percy, her son Joseph and his wife Julia were passing the "Sun Music-hall," and Joseph asked Julia, "Do you remember that place"? and she replied, "Yes; that is where we first met," and witness asked, "When?" he answered, taking the child on his lap, "That was before she was born," is, in

view of all the other evidence, scarcely worthy of serious consideration; besides being denied by Julia, it is otherwise established that she did not know Joseph before this child Florence was born.

### THE STORY OF THE DEATHBED OF JO ASHCROFT.

Much stress has been laid upon the deathbed scene so dramatically described by the counsel as occurring in the cellar when Jo Ashcroft died; but as belief in the statements of what then and there occurred is dependent upon otherwise discredited testimony, the court is constrained to disregard it, even were it important if true; but it does not tally with proved facts, and some of it, for instance, the dying declaration that his wife was then pregnant of a bastard, is too revolting for toleration, and the main reliance for its acceptance is the witness George James Shiells, whom the court cannot credit even against Julia Ashcroft, notwithstanding the appeal of one of the counsel (Mr. Highton): "Is there a judge on the face of the earth, exercising the functions of a jury, who would reject such a witness' testimony and accept that of a person in the interested situation of Julia Ashcroft?" This appeal has been already amply answered.

### WHY DID JO ASHCROFT WANT TO KEEP THE CHILD.

Why was it that Joseph Ashcroft wanted to keep the child Florrie? He was bitterly poor; he wanted money; he had been an unsteady boy and a thriftless young man; he was going about from place to place until 1876—so his mother testifies—and this is in complete contradiction to the testimony of David and Lewis Davis, who say that he was in their shop from 1873 to and beyond 1876; his mother called him a bad boy because he was not obedient and could not keep his places. (See judge's manuscript notes, page 237, volume 3.) He was willing to be rid of the child, but he wanted to have control of the £30 promised by Blythe to Julia; his own mother's description of his shiftless character corresponds with Julia's statement that he was too lazy to work; his motive in desiring to secure possession of the child was in perfect keeping with his general character, as portrayed by

his mother and his wife. (See, also, testimony of Mrs. Sarah Bailey, judge's manuscript notes, page 747, volume 9.)

### THE TIN BOX MARKED F. M. C. P.

But one of the counsel for the defense (Dr. Edward R. Taylor) claims that there is an item of evidence here furnishing "confirmation strong as proofs of the Holy Writ" of the falsity of the pretensions of plaintiff: the tin box marked F. M. C. P., and the counsel dilates upon the terrible meaning and significance of those initials, irrefragable evidence of perjury of Julia Ashcroft, and says that this box now in court is appropriately used as a receptacle for the exhibits in plaintiff's case, and may also be appropriately used as a coffin for her case (it may be observed here, in parenthesis, that the same tin box or casket contains also the exhibits in the case specially represented by this counsel), but what does it amount to in the quality of evidence? Do the initials indicate the paternity in Ashcroft? Obviously not. Was the girl ever called "Maud" or "Crisp" by anybody? There is no scintilla of testimony to this effect; no one intimates in any way that she was ever so known. The fact is, the box is without any value whatever as evidence in the case. Possibly she was called at times, from temporary association, "Flora Perry" or "Florrie Ashcroft," and may have called Mrs. Ellen Ashcroft "Grandma" and Jo Ashcroft "Papa"; but when we consider the physical facts proved in this case, these minor incidents import nothing, much less perjury, or false personation, or colossal conspiracy and fraud, as charged by the defense.

If, in the consideration of the issue of paternity of plaintiff, some witnesses have not been accorded mention, it is because, in the opinion of the court, their testimony is not of sufficient importance to merit attention.

### THE ISSUE OF PATERNITY MADE OUT BY STRICT AND PLENARY PROOF.

It has been shown here, on the part of plaintiff, that prior to March, 1873, Blythe alone had access to Julia Perry. There is not the least particle of evidence that Joseph James Ashcroft had access to her before that year; not even Shiells

testifies that he saw them together prior to July, 1873. Even if his testimony were true, it only refers to between July and December, 1873; but even then its falsity is manifest in and of itself, irrespective of other evidence. There is positively no trustworthy testimony—no evidence—against the issue of paternity in Thomas H. Blythe. It has been shown by strict and plenary proof that he was the father of the plaintiff in this action, and this court so finds and determines.

But that is only one issue upon which plaintiff rests her claim to heirship. What is the other or others?

### WAS PLAINTIFF EVER ADOPTED, ACKNOWLEDGED, OR LEGITIMIZED?

Plaintiff's claim is based upon two sections of the Civil Code of California—section 230 and section 1387. Section 230 of the Civil Code reads as follows:

"The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon, for all purposes, legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

Counsel for plaintiff contends that there are here five elements that must be established: (1) There must be an illegitimate child; (2) the plaintiff is that child; (3) the father was Thomas H. Blythe; (4) that he publicly acknowledged her; (5) that he treated her as a legitimate child, and therefore she was adopted and legitimized by him, and is and has been, for all purposes, legitimate from the time of her birth.

The provisions of the statute are to be liberally construed, but the proof of paternity must be strict and plenary.

Relatively it is of little consequence what the rule is in a given case, but it is of great importance to the community, and to society, and to the state, to have the rule of law, so gravely affecting its stability and integrity, and property rights, correctly laid down.

## THE WHOLE QUESTION ONE OF LAW.

The whole question now becomes one of law. The one who has the legal right should secure the estate. The whole question of devolution of property rights depends upon statutory enactments, and there is no natural right in the premises. Plaintiff claims, primarily, under section 230, Civil Code, which requires the institution of heir or adoption to be made by the father. It must be *the father*. The institution of heir is the primary object of the statute. The succession of property rights is incidental; it is a status that is involved; it is the relation of the child to society.

In the opinion of this court, three of the elements of the statute, section 230, Civil Code, have been established: (1) There was an illegitimate child; (2) the plaintiff was and is that child; (3) Thomas H. Blythe, the decedent here, was the father of that child. We are now to consider the question, Was the plaintiff publicly acknowledged by Blythe?

## WHAT SATISFIES THE STATUTE?

What satisfies the statute upon this issue? This is answered in Estate of Jessup, 81 Cal. 457, 21 Pac. 984, in the opinion of Mr. Justice Works, in stating the doctrine applicable to such a case, and I do not interpret the later decision in the same estate as announcing a discordant principle: 81 Cal. 409, 21 Pac. 976, 6 L. R. A. 594.

Is the evidence produced upon the part of plaintiff sufficient to show that the decedent, Thomas H. Blythe, "publicly acknowledged" her as his own child?

To establish his right, a claimant must prove two things: (1) That he is the illegitimate child of the alleged father; (2) that he has been openly and publicly acknowledged and received and treated as such. But in order to avoid imposition and fraud, the statute requires that these things shall be established by certain proof. Under the statute of 1870 it must be proof of his "treating, receiving or [and] acknowledging him publicly as his own legitimate child." That is to say, he must treat, receive or [and] acknowledge him *as if* he were his own legitimate child, and in order that the proof

may be made by disinterested parties, and fraud and imposition avoided, all of these must be done openly and publicly, and not secretly.

Section 230 of the Civil Code, although differently worded, is in effect the same. The language is, "by publicly acknowledging it as his own, receiving it as such into his family, and otherwise treating it as if it were a legitimate child."

### THE MOST SATISFACTORY PROOF.

Undoubtedly the most satisfactory way of establishing the necessary facts is by proof that the claimant has been received into the family and given the family name. But this is not necessary where there is sufficient proof of a reason for not having done either: In re Jessup, 81 Cal. 434, 21 Pac. 976, 6 L. R. A. 594.

Mr. Justice Fox said, in the finally prevailing opinion in the case cited: "It is said that as Jessup was never married he was not bound to receive this child into his family, for he had none in which to receive it; but we do not so read the law. The language is, 'publicly acknowledging it as his own, and receiving it as such, with the consent of his wife [if he is married] into his family, and otherwise treating it as if it were a legitimate child.' If he has a wife, he can only receive it into the family with her consent; but if he has no wife, he must still receive it into his family—that is to say, in such family as he has, the child must be acknowledged and treated as his—*at least, he must not deny to the members of such family that it is his*": In re Jessup, 81 Cal. 434, 21 Pac. 976, 6 L. R. A. 594.

### ORAL DECLARATIONS OF DECEDENT.

The oral declarations made by decedent to various witnesses are numerous and continuous through a course of years, down to almost the hour of his death. To friends and acquaintances he repeatedly and unreservedly made such acknowledgment times without number; it was a constant theme with him, ever upon his lips. The effect of these declarations is hereinafter to be weighed, as matter of law; the fact of their making is easily established.

I. have considered the declarations as to paternity by themselves alone, as near as might be, and separate and segregated from the declarations of acknowledgment, and shall pursue the same course as to the latter.

In one of his conversations with James E. Carr, with whom he had frequent talks about his little girl, in the mountains, at Carr's place, Carrville, Trinity county, California, where he was in the habit of talking about her, he said how nice it would be to have her out and practice music with Carr's little girl, who was very proficient in music; at another time Carr and Blythe had a conversation in Brooks alley, San Francisco, in presence of Hon. John K. Luttrell, and Blythe said he would not again place a dollar of mortgage on the western part of his property, but he would dispose of the lower half and improve the upper part for the benefit of his little girl, for Florence or Flora. In December, 1882, about Christmas or New Year's, witness had a conversation with Blythe, in which the latter said that W. H. H. Hart had advised him to have adoption papers, but he did not think it necessary, as he acknowledged the child; once, in 1878, Blythe told witness that ex-Governor Haight had drawn for him a will (judge's manuscript notes, page 67, volume 1; official reporter's transcript, page 1127, volume 4); he said he intended to leave the western portion of his property unmortgaged for his little girl, and improve it for her. (Official reporter's transcript, page 1130, volume 4.)

Blythe said to Varney that he wanted the westerly part of the block free and clear for the little girl he was going to get out from England; that he intended to build the westerly half of the block all over, so that she could have it. In 1881, when Nicholas Luning had made his brag that he would own the block, Varney told Blythe of this, and the latter determined to lift the mortgage and rid himself of Luning, and he said to witness one day, standing in the alley, that he had made arrangements to get money from Mr. Parrott, and he had two objects in doing that: one was to be released from Luning, and the other was that he wanted the westerly block entirely free and clear for his little girl Florence. (Official reporter's transcript, pages 1354-1356, volume 5; judge's manuscript notes, pages 77, 78, volume 1.)

To Andrew Mortimer Davis the decedent said, in the fall of 1882 or the early part of 1883, prior to his departure for Mexico, pointing to a map that he had in the room, in his office, 724½ Market street, and the plans of a canal that he was cutting through his Mexican property, he showed a certain point that he said was one of the most beautiful spots on earth: he said that that was where he would spend his old age with his child, who was then in England; and Blythe said to witness: "This block which you all talk so much about is but a mere speck on the map," and then went on to show to witness the immense extent of three million acres of land; and witness sagely observed to decedent: "Mr. Blythe, if it had not been for this speck, you would never have had this map; be very sure that this map don't cost you this speck." (Official reporter's transcript, pages 1502-1509, volume 5.)

In 1881 the decedent told Jerome Deasy (who is quoted here because he is corroborated by other witnesses) on the night of the day he had effected a release of the mortgage on the west half of the block from N. Luning, that he felt good because that portion of the property was now free for Florence, who would be provided for. (Official reporter's transcript, page 1526, volume 5; judge's manuscript notes, pages 86, 87, volume 1.)

To Milo Sidney Jeffers he spoke of plaintiff on a number of occasions. On the last day of his life Blythe said to Jeffers: "You will have to go and get Florence; I shall never be able to get her." (Official reporter's transcript, page 1574, volume 6.) This remark was made at about 4 o'clock in the afternoon of the day of his death. The witness gave a dinner in honor of Blythe, on the occasion of the latter's sixtieth birthday, in 1882, Sunday, July 30th, when General Andrade was present, when Blythe exacted of Jeffers a promise that if he (Blythe) died, the witness would be faithful to his child Florence. (Official reporter's transcript, page 1758, volume 6; judge's manuscript notes, page 99, volume 1.)

### CORROBORATIVE EVIDENCE.

This evidence is corroborated by that of the defendant, Alice Edith Blythe, who says, concerning certain photographic pictures of plaintiff, that she and the decedent had

some conversation about those pictures, and he said he was pleased to see that the child looked well cared for and was well clad, as she was delicate; he called the child "Florence"; he was constantly speaking of her after he wrote the first letter to her; in fact, the witness says, she herself composed that first letter, and she and he were about a week engaged at that; decedent was always talking about his plans for Florence's future, and he would discuss about his religious views; he said that although he was something of a skeptic, and was constantly studying spiritualism, he wanted to have the child free as to choice of religion, but wanted her baptized and well instructed; one evening, after a late dinner, he had been drinking a good deal of wine, and he asked witness if she had seen George S. Irish, of whom he said he thought a great deal, that he was his ideal of a steady and bright young man, and he destined him to be the husband of Florence when she came from England, and he thought they would carry out his ideas in Mexico, and that they and the witness, if she should live, would perpetuate his name; witness told him that from what she saw of the girl's picture she judged the girl as very light, blonde and of nervous temperament and quick temper, and that she thought Irish was very much the same, and that being of similar dispositions they would not be a suitable match; but he said that he had set his mind on this, and would not be balked in or dissuaded from it. Upon the occasion of his sixtieth birthday, when he returned after the Jeffers dinner, he told this witness what had taken place there and about the mutual vows between him and Jeffers and Andrade. (Official reporter's transcript, page 1758, volume 6.) He drank a good deal of wine, and, speaking about Florence, he insisted that witness should join him in a glass, which she did, and then he insisted that she should kneel down and vow that in case of his death she would look after Florence and see that the child had her rights; after the return of decedent from his last trip to Mexico, he expressed himself as very much disgusted; that he had discovered discrepancies in the character of his ideal, George Irish; that he was not at all what he had thought him to be, and that he had changed his mind about making him the husband

of Florence, and that he should not have her. now.    (Judge's manuscript notes, pages 545-547, volume 6.)

The testimony of Jeffers in regard to the episode at the birthday anniversary dinner to Blythe, July 30, 1882, is also corroborated by General Guillermo Andrade, the other guest of the occasion.    (Judge's manuscript notes, page 424, volume 5.)

To Montgomery Godley, Thomas Drake Matthewson, Luman S. Pease, Morris M. Estee, Charles Nathan Palmer, Thomas Francis Palmer and John K. Luttrell he made similar statements already noted.

To Henry de Groot, who suggested to the decedent, on a visit to him in May, 1882, at 6 O'Farrell street, that in view of the contingency of death he ought to have his affairs in good shape, Blythe acquiesced and said that he had an impression or foreboding that he would not live long; he seemed very much depressed on that account; he said that lately, since he had become ill, he had a strong desire to send for his daughter; that he would like to have what he never had— a home of his own, but that his domestic arrangements seem to present a difficulty about bringing out his girl.    Witness said he thought a moneyed consideration, a few thousand dollars, might cause a good-looking young woman to prefer her freedom, and take her chances of marrying a younger man in preference to keeping house for an older man.    Blythe said impatiently that he had thought of that, but he didn't want to terminate those relations abruptly, and an expedient had occurred to him of adopting her as his niece, and he said he had done so.

So far as oral acknowledgments go, the foregoing abundantly attest the claim that the plaintiff was publicly acknowledged by the decedent.    Again and again to numerous and divers persons, without any reservation or qualification, and without any suggestion of secrecy or caution of concealment, sometimes in the most public places on the streets, and in circumstances that precluded privacy, he proclaimed his paternity and acknowledged this child as his own.

OF WHAT VALUE ARE THE LETTERS OF BLYTHE AS A PUBLIC AC-
KNOWLEDGMENT?

There is one letter certainly that may be considered in this connection, the letter addressed "Florence Blythe," that went through the postoffice so superscribed. What could be more public? The envelope (Plaintiff's Exhibit 60), postmarked "San Francisco, August 11," is addressed as follows:

FLORENCE BLYTHE,
care Mr. H. Beach,
11 Bridge street,
Deansgate,
Manchester,
England.

This letter is as follows:

PLAINTIFF'S EXHIBIT 60A.

San Francisco, May 8, 1882.

My Own Dear Child: The four photos and grandpa and your letter all received safe. I am very much pleased with the photos; they are remarkably well executed, and papa's little daughter looks so nice and happy in them. Say to grandpa that papa feels very grateful to him for sending the photos, but that he is very sorry to learn of grandpa serious illness, and that he sincerely hopes that grandpa is entirely recovered by this time. When papa sent you a list of his favorite pieces and songs, he did so, not in the expectation that you were far enough advanced in music to play them, but only to give his daughter a general idea of her papa's taste in musical matters. When you are ready to practice the "Old Hundred," papa will send you the words as altered by himself. Some people think the words are prettier the way papa has changed them, and your Cousin Alice sings them in that way. Papa is very anxious to have his darling little daughter with him, and my efforts are earnestly directed to arrange my business to that end. I know it is difficult for you to understand this matter; but I will say that some of my business affairs are very extensive and unwieldy; that I have to wait and depend upon so many contingencies.

I do not wish you to meet with disappointments, and for that reason I will say to you not to make up your mind too sure that papa will be able to come to England this summer. If I can possibly come, my dear child may depend that I will come, and that I will use every effort to that end. When you are a little older papa will expect you to take charge of his home. At what age, think you, you will be able to take charge of papa's house? Papa is much pleased to learn of the progress you are making in your studies; but more than all, he is pleased to find that your health is constantly improving. Now, my dear child, your papa does not wish you to overwork your young mind in too hard studying. From what I can judge, you are progressing very fast—fast enough —in your studies, and your papa is very proud of it; but your papa feels deeper interest in your health than in all else.

August 10, 1882.

My Own Darling Child: The above was written on the 9th May last and would have been mailed the next day had papa not been taken too sick to get to the office. This sickness lasted longer than the doctor or I expected. However, I am pretty well over the gout attack and my general health is excellent, and now attend to my business as usual. I should only have been too happy to have made the trip to England this summer to see my own dear child, were it in any way possible. But the condition of my affairs are such as to render a postponement of that visit unavoidable. I regret much to have to disappoint my dear little Flora, but there is no help for it. I look with pleasure to the day I can clasp my dear child in my loving arms. Papa sends all his love to his dear Flora, and asks her to wait patiently. From your most affectionate papa,

THOMAS H. BLYTHE.

P. S.—Give my kindest regards to grandpa and grandma.

WHAT IS NECESSARY TO ESTABLISH.

Under section 230, Civil Code, the claim contended for by plaintiff is adoption and legitimation, and one of the counsel for defendants (Geo. W. Towle, Esq.) says that by that section four facts are necessary to an adoption of an illegitimate child by its father:

1. He shall be the natural father;

2. He shall have publicly acknowledged himself to be the father;

3. He shall have received the child into his family;

4. He shall have otherwise treated it as his legitimate child.

This arrangement of facts essential to be established is substantially the same as that which we have been considering, and brings us to the next proposition of the statute:

### DID DECEDENT RECEIVE PLAINTIFF INTO HIS FAMILY?

It is not designed here in this opinion to deal with the character of the relations existing between the decedent and the defendant Alice Edith Blythe at the time of his death, nor for the years immediately prior thereto, but it has been shown satisfactorily that his domestic arrangements were not such as to justify him in bringing the child out to San Francisco, and there is sufficient proof of a reason for not having done so. This is shown notably by the evidence of Dr. De Groot, but at least he did not deny to the members of such family as he had that the child was his: Mr. Justice Fox, In re Jessup, 81 Cal. 434, 21 Pac. 976, 6 L. R. A. 594.

The defendant Alice Edith Blythe herself testifies that she dictated the first letter to the child Florence, followed all her studies and took a great interest in her, and, in fact, if she had been her own child she could not have taken a greater interest, and so the witness said to Mr. Blythe. (Judge's manuscript notes, page 551, lines 10-13, volume 6.) And the same witness says in her cross-examination, when the Plaintiff's Exhibit 54, the letter dated October 21, 1881, from Mr. Blythe to Florence, was exhibited to her, that that was not the letter she composed, and is not an exact copy of it; it has some of the ideas, something about cats and dogs and household pets; she could not pick out any particular phrases or words or expressions; she and decedent were for about a week or so composing the letter; he said it was a new pose for him as a father, and he hardly knew how to write to a child, and asked witness to assist, so she wrote from time to time, and he made selections, and finally told her he had written a letter to suit himself in his office. (Judge's manuscript notes, page 557, lines 5-16, volume 6.)

The defendant Alice Edith Blythe further testified that she made no objection to Mr. Blythe acknowledging this child; she concurred in it thoroughly; Mr. Blythe was very anxious that she should concur in it; he was pleased to learn that witness was satisfied with his designs for the little girl, and that she concurred with his wishes and offered no opposition; witness told decedent that she had a right to be consulted as his wife in such a matter; Mr. Blythe was glad to have her concur, because he knew that if she should be jealous of the little girl, or object to his corresponding with the mother, the witness could make it disagreeable for him. (Judge's manuscript notes, page 557, lines 16-25, volume 6.)

Whatever the relation may have been that the defendant Alice Edith Blythe bore to the decedent Thomas H. Blythe, whether she was housekeeper, mistress or wife, or the female head "of such family as he had" (81 Cal. 434), here was a consent, full, unequivocal, complete, to the adoption and acknowledgment of the child; but it was not necessary, in view of the reason assigned by him, "that his domestic arrangements" presented a difficulty about bringing the girl to San Francisco, that he should actually have taken her into that household; he did all that was presently practicable before he died, and there is sufficient proof for his having done no more. His acts abundantly attest compliance with the code, section 230, Civil Code, up to this point.

The final requirement of the section 230, Civil Code, is:

### DID BLYTHE TREAT PLAINTIFF AS A LEGITIMATE CHILD?

One of the counsel for the defense (Dr. Edward R. Taylor) says that it is past all belief that a man, even of Blythe's tastes, if he intended to adopt the child, would have left her with the Perrys. It is not the purpose of this opinion to panegyrize the Perrys; but, to adopt the remark of the same learned counsel in adverting to the abuse bestowed by an adversary upon opposing witnesses, even the Perrys may not be wholly depraved. (Judge's manuscript notes, page 767, line 13, volume 9.)

James Crisp Perry may not be a model man, but his various occupations have nothing to do with the paternity of the child and the acknowledgment by Blythe, and the child was

not ill-treated by him, but, as the facts showed and as Blythe said, was well clad and well cared for while in the keeping of the Perrys, and was certainly in better hands than with the Ashcrofts; it is shown that the money sent to Julia was not used for the child, but was appropriated by Joseph, who by compulsion caused his wife to write the letter (Plaintiff's Exhibit 18A) to Blythe. (It was by force of him, as she testifies, that this letter was written, and Mrs. Sarah Bailey corroborates this testimony.) And it was because of his knowledge of Joseph that the grandfather, Perry, wrote to Blythe concerning his son in law and his marriage to Julia, the letter:

## PLAINTIFF'S EXHIBIT 17A.

16 Sidmouth Street, Gray's Inn Road,

London (W. C.), England, November 12, 1879.

Dear Sir: I take the liberty of addressing you as a father to a father. I do not know if you are aware that my daughter Julia is married. She was married on the 25th of December, 1876, very much against my wish, to a worthless fellow named Joseph Ashcroft. And the money you have sent from time to time for Flora's maintenance, I have not received one penny of it, nor the child. Julia has always squandered it on herself and husband.

The last time little Flora went to her mamma's for two or three weeks Julia and husband ill-used the child, so that she was quite ill indeed, so poorly that I would not allow Flora to remain with her mamma any longer. I have just heard that Julia has sent you a solicitor's letter. I trust you will take no notice of it, as it is only to extort money to keep her husband in idleness and dear Flora will derive no benefit from it whatever. My daughter's husband sent me a threatening letter about ten days ago, demanding £25. Because I will not send them the money they think they will frighten you into sending them some money.

Julia knows that I am very much attached to my little granddaughter and I will not allow them to have the child to ill-use and keep her in rags and dirt. Julia and her husband have been to the magistrate to get an order to make me deliver up the child. The magistrate sent an officer to see

Flora. The officer asked Flora if she would go to her mamma or stop with her grandpapa; the child told him at once that it would break her heart if I sent her to her mamma. The magistrate told Julia he could not assist her and that she had better let the child remain where she was happy and well cared for, as he thought the child was old enough to know where she was best cared for. The reason Julia and her husband wishes to have Flora with them is in case you should make inquiries about her. The last time dear Flora went round to see her mamma she sent her back with my servant, saying she and her husband could not be annoyed with the child there; therefore you cannot wonder if the child has not got much love for her mamma, as she has never acted as a mother towards dear Flora.

As a father I am sure you will take my remarks in the kindly spirit in which they are dictated. I wish to refer to your dear, little, lively Flora. As I have told you, I have had the entire charge of her for this last three years—board, schooling, and clothing and attendance. Of course each year these charges were heavier, but it is not of that only on which I write. The little pet will be six years on the 18th of December, and she is remarkably bright and intelligent for her age, and although lively and playful as any little kitten she is nevertheless a delicate and nervous child and remarkably sensitive, and will require more than usual care in the next few years to fit her for the part she may have to play in the battle of life.

I only wish you could see her, for I am sure you would be proud of her, and as a man and a father would only be too anxious to do all that is necessary for her welfare. Indeed when we speak of her father in her presence, she always says that could she see you all her little wishes would be granted, and every night she offers up a prayer that her papa may be restored and returned to her. Many little anecdotes I might relate about her love for her absent papa, but space will not allow.

Now, my dear sir, I do not want anything for keeping dear Flora. I only want you to invest the £30 a-year which you promised to pay towards her maintenance; if you will place it in the hands of a trustworthy solicitor, as I am getting up

in years now. I wish you to invest it for Flora's sole use, that no one can make use of it but Flora, and not even her till she is of an age to make proper use of it to start her in life. Dear sir, I am quite willing to clothe and educate dear Flora. All I want is for you to invest something for Flora that her mamma and her husband cannot touch. At the same time you will see the necessity, as the author of her being, of providing some certain fund for her maintenance, because we know not what an hour may bring forth.

Thinking thus, I imagine the proper and creditable thing for you to do would be to send a solicitor to see Flora, when I could explain things to him; then you could invest a fund for her maintenance, in which I would be trustee, and see the interest devoted to her sole use.

I beg you to consider carefully this matter, for bear in mind I am not writing for myself, but solely in the interest of your very promising daughter; and I am sure, when you reflect upon the physical relations in which you stand, saying nothing of the moral and religious obligations, I may safely trust to receive a generous response to this request.

With kisses and best love from dear Flora to her dear papa. Will send her photo in next letter. . . . .

Awaiting your reply, I am, yours obediently,

JAMES C. PERRY.

To T. H. Blythe, Esq.,

This letter evoked the following response from Blythe (Plaintiff's Exhibit 48) dated "December 10, 1878" (evidently mistakenly written for "1879").

PLAINTIFF'S EXHIBIT 48.

San Francisco, 724½ Market street,

December 10, 1878.

James C. Perry, Esq.

My Dear Sir: Your letter dated November 12 received with pleasure and thanks.

For some time past I have had serious suspicions that all was not right in the surroundings of little Flora. .

I wrote to her mother some time ago requesting specific answers to certain inquiries; the answers were not definite or

satisfactory. This strengthened my suspicions. Being at
the time much pressed and absorbed in business I had to defer
further investigations and wait developments. Your letter
comes very opportune. Julia never said a word to me of
having been married. Yor timely warning as to the intention
of parties to send me a solicitor's letter is kindly received.
It seems that I have of late been a special object for attempts
at extortion, etc., etc., which makes me particularly alive to
such things. The absence of any effort on my part to find
out the real condition of Flora did not spring from indiffer-
ence to her or her future. The last three years with me has
been an era of storms and trials, but through all I clung to
the hope of being able to arrange my affairs so as to take a
short trip to London and see for myself how things stood.
Although I now see signs of a smoother future, with pros-
pects of a partial release from the severe pressure of business
which I have so long been subject to, yet I find it will be some
time before matters will be such as to permit a visit to Lon-
don. In the face of the possibilities and uncertainties of
things your suggestion to invest the £30 per annum in favor
of little Flora in the manner mentioned in your letter is rea-
sonable and prudential and shows a deep interest on your
part in the welfare of your little charge. But that precau-
tion is really not needed, as my *Will* is already written, and
little Flora is there provided for. The late Governor Haight,
my friend and counsellor for twenty years, was appointed by
the Will Flora's guardian. The Governor being dead, I shall
substitute yourself in his place in a few days—as soon as
time permits me to rewrite the instrument. Your goodness
in proposing to support and educate Flora at your own ex-
pense is fully appreciated, but with the present prospects of
more leisure on my part and other considerations I could not
well accede to the suggestion to lay all this burden upon your
generosity. But I will refer to this again before long. I
cannot express to you how deeply I feel your kindness and
protection you have extended to your little granddaughter.
I hope she may live to bless you for it. Please kiss her for
me and say to her that her papa wants her to be a good little
girl, always to obey her grandpa in everything and never for-
get to pray every night for her papa, who is far away, and

then he will surely be restored and return to his little daughter. With kindest wishes I remain, your most respectfully.

THOS. H. BLYTHE.

P. S.—I should be much pleased to receive Flora's last photo.

T. H. B.

### THE TESTAMENTARY THEORY OF PLAINTIFF.

This letter shows that the writer had made a will, and that in favor of his child: "My *Will* is already written, and little Flora is there provided for. The late Governor Haight, my friend and counsellor for years, was appointed by the Will Flora's guardian. The Governor being dead, I shall substitute yourself in his place in a few days—as soon as time permits me to rewrite the instrument." The testimony of W. F. Sayers (clerk for Haight & Taylor, the firm composed of ex-Governor Haight and Dr. Edward R. Taylor), introduced to show negatively that there was no will, because there was no charge for the drawing of a will in their books, has a tendency to show the contrary fact; he says he remembers having been called in by ex-Governor Haight to witness Mr. Blythe's signature; he did not remember whether it was a will or not; the ex-governor signed as a witness also; it was about the latter part of 1877 or the early part of 1878; Mr. Blythe signed the document, Sayers and ex-Governor Haight witnessed the signature; it was about the time of the Nellie Firmin case; the document was in ex-Governor Haight's handwriting; it was drawn by the governor while Blythe was in the room; he had evidently written it immediately before; this was in Governor Haight's inner office. (Official reporter's transcript, pages 5577-5595, volume 18; judge's manuscript notes, page 313, volume 4.) This testimony is strongly confirmatory of the statement made in the letter of December 10, 1878 (1879), hereinbefore recited at length, and supports the testamentary theory of plaintiff.

Counsel for defense (Dr. Edward R. Taylor) energetically combats the assumption of acknowledgment and adoption, and quotes more or less appositely from Mrs. Elizabeth Barrett Browning's poem of "Aurora Leigh," in which he says

all the phases of life are seen with the eye of a poet, than which no eye sees clearer, the most mature of the author's works, and the one into which (as she herself says) her highest convictions upon life and art entered:

> "You take this Marion's child, which is her shame
> In sight of men and women, for your child,
> Of whom you will not ever feel ashamed?"
>         "Here, I take the child
> To share my cup, to slumber on my knee,
> To play his loudest gambol at my foot,
> To hold my finger in the public ways,
> Till none shall need inquire, 'Whose child is this?'
> The gesture saying so tenderly, 'My Own.'"

These lines of poetry, says the counsel, express the whole law of adoption; the decedent never did this with the child Florence, he never came in contact with her, never saw her; he might have taken a trip to England and be back almost in thirty days, but with all his "idolatrous affection" for this girl he never did so; his intention may have been so to do, but if so, it was never executed. It may be answered that death interfered with its execution.

But it is said he provided for her; and how did he provide for her? asks counsel opposing her pretensions. How did he save her from the "cold charity of London"? And the counsel proceeds to make a close calculation as to the exact amount that the decedent contributed to the support of his child. He might have brought the child here to come springing to his arms, but he did not do so; he never intended to do so, asserts counsel, he intended to take her to Mexico, a foreign country; he had a household here into which he might have brought her—a comfortable home. No matter whether the woman living there was housekeeper, mistress or wife, she was a woman capable of caring for a child. The answer to this argument may be found in the extracts from the evidence of the defendant Alice Edith Blythe and Dr. Henry de Groot, hereinbefore quoted.

How did he provide for her? queries counsel. Did he do his duty as a father?

"The parent entitled to the custody of a child must give him support and education suitable to his circumstances," says section 196, Civil Code.

### DID BLYTHE DISCHARGE THIS DUTY.

In view of the amount of his gross income, there would seem to be some ground for criticism as to the scantiness of the father's remittances for the maintenance of his child; but this fact must be considered with the other facts in the case, one being the absorption of his revenues in the many speculative and unremunerative enterprises which were consuming his ready resources and occupying his attention and time, interfering, as he said, with his early return to England; and another being that her grandfather Perry never made any demand for money in any one of their letters, and they were voluntarily contributing to the support of the child, and what Blythe sent was so much in addition; besides, she was then an infant, and did not require a great deal for her support and education; and whatever may be said of the Perrys, it cannot be gainsaid that they did much for this girl in attending to her training, and that she shows the result of careful culture in mind and good nourishment in body. Blythe's declarations and correspondence bear testimony to this, and the testimony of the Maclennans in regard to her attendance at school is also of importance. (Official reporter's transcript, pages 1890-1979, volume 6; judge's manuscript notes, pages 109-115, volume 2.)

It would appear, therefore, if the court be correct in its statements and inferences, that all the elements of the statute, section 230, Civil Code, have been supplied.

Now as to

### THE LAW OF THE CASE.

It is inconceivable, incredible, unthinkable that decedent could have adopted a child whom he had never seen and who had never been in California before his death; it could not have been done; the law of the domicile of the mother of the girl governs, and there is in that country (England) no law of adoption, and, consequently, it could not have been invoked in favor of the plaintiff-claimant—thus contends counsel adverse to plaintiff; but the assertion or contention that she, being of an alien extraction, never within this jurisdiction until after her father's death, could not have been acknowl-

edged and adopted in accordance with the statute of California, is not a valid deduction.

The law must be taken as it is written, and there is no such limitation in the language of the statute, and no such interpretation within its spirit. It is concerned only with the acts of the father performed here, the domicile of the father, no matter where the object of the act is situated, at home or abroad.

We have been treated to much learning and many references more or less remote and recondite, on the general subject of adoption and institution of heir, and we have had a very learned and interesting résumé of the early history of jurisprudence in Greece and Rome and England, and a sketch of the progress of legal science down to date; but the question finally resolves itself to the plain and simple proposition:

WHAT IS THE LAW OF CALIFORNIA, AND HOW DOES IT OPERATE?

All that the law of California requires is such recognition and acknowledgment as have been here established in evidence. There were good and sufficient reasons why the child was not brought here up to the time of the father's death. The great amount of legal learning brought to bear upon this issue by the counsel adverse to the plaintiff-claimant is as irrelevant as it is remote and foreign. It has no application to the circumstances of this case, in the opinion of this court.

Whatever might be the law of England, or of another country or state, in respect to the status of plaintiff there, it cannot control the canons of descent in California; the statutes of succession here are solely dominant: the Civil Code of California bestows upon plaintiff here the capacity of heir; if the acts of decedent have been proved, it follows that she is his heir. It is the statute of California that is under discussion, and not the law of any other country or state. Our statute settles the question here, and, if I have correctly apprehended its meaning, there is no room for further controversy. One of the objects of adoption and of legitimizing by adoption is to give the capacity: Justice Fox, In re Jessup, 81 Cal. 422, 21 Pac. 976, 6 L. R. A. 594.

FOREIGN LAW NOT APPLICABLE TO THIS SUBJECT MATTER.

The laws of descent of England and Scotland are not like ours, and the questions there decided cannot apply to the subject matter of this controversy. It may be stated, as a proposition that admits of no dispute, that it is within the legitimate scope and power of the legislature to prescribe canons of inheritance which shall absolutely determine the course of descent of all lands in this state. The law of another state as to the status can have no influence in determining upon whom the descent is cast: Harvey v. Ball, 32 Ind. 98.

The statute is not limited in its operations to residents of the state: Kolbe v. People, 85 Ill. 336.

In Wolfe's Appeal (Pa.), 13 Atl. Rep. 760 (a case which was connected with the Estate of Samuel Sankey, a will contest tried and determined in this probate department, in which the principle involved in this question incidentally arose), the supreme court of Pennsylvania decided, April 24, 1888, that the court has jurisdiction to decree an adoption by a petitioner who lives in another state and who is merely a temporary resident or sojourner in the country. The purpose of the adoption act, says the court, is to promote the welfare of the child to be adopted.

The case of Foster v. Waterman, 124 Mass. 592, turned upon the peculiar statute of New Hampshire, which is unlike ours, as is shown by the opinion of Chief Justice Gray, which, being brief, is hereunder quoted in full:

"The law of New Hampshire, as recited in the case stated (which is the only evidence thereof before us) declares that, upon a decree of adoption according to that law, the child shall become to all intents and purposes, including inheritance and all other legal consequences and incidents of the natural relation of parent and child (except taking property expressly limited to heirs of the body), the child of the persons adopting him, and contemplates that immediately upon such decree, their domicile shall become his.

"Such a statute is not to be presumed to extend to a case in which the domicile of those petitioning for leave to adopt a child is in another state; the provision in the statute of New Hampshire, that the decree may be made in the county where the petitioner or the child resides, implies that the

statute is intended to be limited to cases in which all parties have their domicile in that state, and there is no presumption in favor of the jurisdiction of a probate court, exercising a special authority conferred by statute, and not according to the usual course of proceedings at common law or in chancery: Commonwealth v. Blood, 97 Mass. 538; Galpin v. Page, 18 Wall. 350, 371, 21 L. ed. 959.

"It being admitted in this case that both the parents by adoption always had their domicile in this commonwealth, it follows that, upon the facts agreed, the decree in New Hampshire was of no legal effect, and it is unnecessary to consider how far a legal adoption in another state can confer rights of inheritance or succession in this commonwealth."

Ross v. Ross, 129 Mass. 245, 37 Am. Rep. 321, so far from absolutely settling this case against the plaintiff's claim, does not cover the circumstances of this controversy. Our statute (section 230, Civil Code) stands by itself, and is not to be affected by the principles declared in the Massachusetts cases. It is neither useful nor necessary to allude further to the cases cited from other countries or states. It is enough to say that none of them, in the opinion of this court, can be brought to bear to defeat the benign purpose of section 230 of our Civil Code, the language of which is plain and the purpose perspicuous.

### THE PLAINTIFF'S CLAIM UNDER SECTION 1387, CIVIL CODE.

We now come to the second statute under which the plaintiff claims as heir of the deceased, Thomas H. Blythe—section 1387, Civil Code—which provides that: "Every illegitimate child is an heir of any person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child."

Did Blythe so acknowledge in writing in presence of a competent witness?

In order to comply with this statute there must be a paper formally made and executed, and the intention must be clear: Pina v. Peck, 31 Cal. 359; Estate of Sandford, 4 Cal. 12.

There must be a competent witness, not a mere spectator, but a witness in such case as this must be one who sees the execution of a paper and attests it as a witness to confirm its

authenticity in anticipation of being called to testify to the act; there is an absolute necessity that there should be an attesting witness called for that purpose by the subscriber, and there must be an express intention on the part of the latter to make the acknowledgment of the illegitimate as heir.

## THE STATUTE SHOULD BE LIBERALLY CONSTRUED.

The statute, section 1387, is to be liberally construed, the same as all the other sections of the code, with a view to effect its object and promote justice (section 4, Civil Code) when applied to acts occurring since the passage of the codes: In re Jessup, 81 Cal. 419, 21 Pac. 976, 6 L. R. A. 594.

Now as to the so-called "adoption paper," upon which the plaintiff seems mainly to rely under this section 1387. Is there such a paper here established in evidence? If the execution and contents of such a document be proved, it constitutes an acknowledgment in writing fulfilling the requirements of the statute and placing beyond all jeopardy the title of plaintiff to the estate of the decedent.

If the document recited in the complaint and erroneously denominated an "adoption paper" have any value, it furnishes a complete muniment of title as heir to the estate of Thomas H. Blythe. It makes her "an heir," and, if the only child of an unmarried man, the sole heir.

What is the character of this paper? The counsel for defense (Dr. Edward R. Taylor) says, if it have any character, it is testamentary, and must be so proved: Code Civ. Proc., sec. 1339; Estate of Kidder, 57 Cal. 282.

This is not so in point of law. It differs radically from a will, which is ambulatory in its nature and may be altered or revoked any time before death, but not so with such a paper as this, which, once executed, is irrevocable; it created a status that could not thereafter be changed; the moment the writing is executed in conformity with the statute, the "illegitimate child is an heir," and no subsequent act of either party can alter that legal relation.

There is no doubt in the mind of the court that the decedent Blythe designed formally, by written instrument, to adopt the plaintiff. Some testimony to this effect is furnished by the defendant, Alice Edith Blythe, in her cross-

examination (judge's manuscript notes, page 558, volume 6), when she says that, before going down to his ranch the last time, he spoke to her one morning at breakfast and asked her how she came to be baptized a Catholic, and she told him it was done through the lady and gentleman who adopted her when she was a little child; he said, "Nonsense, they did not adopt you—you were simply left there by your mother"; the witness said they had adopted her, because she always called them "father" and "mother"; Blythe said that that did not make an adoption; that there must be a legal form; they should consult lawyers and have it done according to law; and then he arose from the table, put his hands in his pockets and paced up and down the floor and said: "Don't you know that is what I must do for the little one." This was in the early part of 1883—January or February. She knew that that was the time, because then they used to have fires all the time in the parlor. The testimony of Carr, Estee, Luttrell—all are to the same effect. Concerning the design of decedent there can be no doubt, but as to its execution?

In view of the antecedent facts showing the design of the decedent, the court would be disposed to view favorably testimony to establish its execution and contents, and to resolve any doubt it might otherwise entertain in favor of the allegation of its existence; but the fact of the execution of such a document depends entirely upon the testimony of W. H. H. Hart, one of the attorneys of record for the plaintiff, and one of the most active of her counsel in the conduct of this cause in every stage of its progress, who has been permitted by the court to testify to the very verge of professional propriety, and possibly beyond, and whom the court could not allow to go further without, in its judgment, violating the sanctity of the relations between attorney and client, and while his evidence as to execution may be accepted, the contents of the paper remain dependent upon the testimony of the witness Gutierrez, whose story is circumstantially improbable.

The testimony as to the finding of the paper (Plaintiff's Exhibit 223) may be true, but it is too great a strain upon the credulity of a court, already sufficiently taxed, to accept it (judge's manuscript notes, pages 119, 120, volume 2); especially in view of the evidence of ex-Judge E. D. Sawyer,

who testifies that he had a conversation with Varney in which he asked him if he (Varney) knew of any adoption paper, and Varney said he did not; this conversation occurred eighteen months or two years before the date of testifying (September 25, 1889), and after the filing of the second amended complaint, in which the paper is set up; this was the only conversation Sawyer had with Varney on that subject, and he went expressly to interview Varney about the paper; it was before that time that Varney says he found the paper, his knowledge of the existence of which he denied to ex-Judge Sawyer.

This document, of incalculable importance if established, was not put, as it should have been, in a place of safe deposit, but placed by its finder where it might easily be lost or destroyed, in his box in room 22 of the old building, 724½ Market street.

Varney may be veracious, but in this instance he lacks corroboration, and suffers from impeachment by a witness who needs no sponsor.

As to the evidence of Gutierrez, little need be said. It is barely possible his tale may be true, but the court does not feel justified in believing a witness who had for so long a time withheld his knowledge of a fact of vital consequence to the cause of truth; he was present when the public administrator's attorney and others were searching for papers in the office of decedent a day or two after the death of Blythe; he aided some of them in looking for papers; John A. Wright, attorney, Administrator Roach and his clerk, Mr. Barry, and Mr. W. H. H. Hart and others were there; and yet this witness revealed nothing about this paper that he testifies he compared with Blythe. (See judge's manuscript notes, page 197, volume 2.) Gutierrez remained a long time thereafter in the service of the administrator of the estate, had frequent conversations with Mr. W. H. H. Hart, the attorney for plaintiff, who was eager and zealous in quest of every item of evidence of advantage to his client's cause, and yet he leaves the service of the administrator with this precious secret within his breast undivulged, and never hints his knowledge until long after the trial in court began.

The testimony as to the comparison of the document is, in the circumstances narrated by witness, intrinsically improbable. It is absurd to say that he wanted the aid of Gutierrez to detect or correct Hart's errors in orthography, and there was no necessity of comparison; it was already read and compared between Blythe and Hart, according to the latter's evidence, and the original executed.

It is barely possibly that Gutierrez told the truth, but taking his testimony all through, it is extremely improbable, and the court declines to substitute a bare possibility of truth for an extreme probability of falsehood in a witness so lacking in the general elements of credibility.

It follows that the case of plaintiff as to the contents of the so-called "adoption" paper, under section 1387, Civil Code, is not established by the balance of proof, and so the court finds and determines.